901 S.W.2d 401 (1995)
PUBLIC UTILITY COMMISSION OF TEXAS, State Purchasing and General Services Commission, Office of Public Utility Counsel and Cities of Abernathy et al., Petitioners,
v.
GTE-SOUTHWEST, INCORPORATED, et al., Respondents.
No. D-2830.
Supreme Court of Texas.
Argued September 13, 1993.
Decided April 13, 1995.
Rehearing Overruled August 1, 1995.
*403 Don R. Butler, Geoffrey M. Gay, W. Scott McCollough, Richard A. Muscat, John L. Laakso, Austin, Luis A. Wilmot, San Antonio, Walter Washington, Norma K. Scogin, Steven Baron, Austin, for petitioners.
Joe N. Pratt, P.M. Schenkkan, Kim E. Brightwell, Susan C. Conway, Patrick F. Thompson, Eva C. Ramos, Austin, Harry M. Reasoner, Houston, William G. Mundy, Irving, for respondents.
HIGHTOWER, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HECHT, CORNYN, ENOCH and OWEN, Justices, join.
This is an administrative appeal from a final order of the Texas Public Utility Commission (PUC) concerning ratemaking proceedings over which the PUC has exclusive original jurisdiction under sections 42 and 43 of the Public Utility Regulatory Act (PURA). On February 23, 1989, the PUC issued a final order which established new rates and resulted in a $59 million annual rate reduction for GTE Southwest Incorporated (GTE).[1] The PUC set January 1, 1987 as the effective date of the rate reduction and ordered GTE to refund $140 million to its customers. The trial court reversed that portion of the PUC's order setting January 1, 1987 as the effective date of the rate reduction and affirmed the remainder of the PUC's order. The court of appeals affirmed that portion of the trial court's judgment concerning the effective date of the rate reduction, reversed that portion of the trial court's judgment which affirmed the PUC's order and remanded the cause to the trial court with instructions that the cause be remanded to the PUC for proceedings not inconsistent with the opinion. 833 S.W.2d 153. For the reasons explained herein, the judgment of the court of appeals is reversed in part and affirmed in part and the cause is remanded to the trial court with instructions that it be remanded to the PUC for further proceedings consistent with our opinion.
The issues before this court are (1) whether under the circumstances present in this case, the PUC has the authority to make GTE's new rates effective on a date prior to the issuance of the final rate order, (2) whether the PUC was compelled by section 41(c)(2) and/or Public Util. Comm'n v. Houston Lighting & Power Co., 748 S.W.2d 439 (Tex.1987), to include losses of unregulated affiliated companies when determining GTE's "fair share" of a reduction in its federal income tax liability, (3) whether the PUC was required to include the income tax deductions actually taken by GTE for expenses disallowed by section 41(c)(3) when determining GTE's federal income tax liability, and (4) whether the PUC's findings of fact were sufficient to support its determination that payments by GTE to certain affiliated companiesGTE Service Corporation and GTE Directorieswere reasonable and necessary operating expenses.

I.
GTE, a wholly owned subsidiary of GTE Corporation, is a public utility and a local exchange company as defined in section 3 of PURA.[2] As such, GTE's rates are governed by PURA. In February 1984, GTE filed a statement of intent to increase the rates it is permitted to charge its customers for intrastate telecommunication services under section 43 of PURA. Several weeks later, the General Counsel of the PUC filed an answer asserting that GTE's current rates may not be just and reasonable and requesting that the PUC review GTE's rates without regard to whether GTE proposed a change to any particular rate.[3] Pursuant to section 43(d) of PURA, the PUC suspended GTE's proposed rates for 150 days and, by agreement, the *404 rates continued to be suspended for an extended period. Several parties opposed the application and/or intervened in the proceeding. Subsequently, this proceeding was postponed pending the outcome of another PUC proceeding which did not become final until January 1987. In March 1987, GTE filed a statement withdrawing its application for a rate increase. In September 1987, the PUC, after determining that some of the parties raised counterclaims or requests for affirmative relief and that GTE should not be able to defeat or prejudice these claims merely by withdrawing its application for a rate increase, permitted GTE to withdraw its application for a rate increase. However, the PUC ordered GTE to file a new application for a rate increase to facilitate a determination of the justness and reasonableness of its rates. On June 1, 1988, GTE filed a new application for a rate increase. The PUC suspended GTE's proposed rates for 150 days and, by agreement, the rates continued to be suspended until February 23, 1989. Although GTE's proposed rates were suspended, the PUC only briefly established temporary rates,[4] and GTE did not implement a system of unofficial bonded rates.
On February 23, 1989, the PUC ordered GTE to reduce its rates to decrease its annual revenue by approximately $59 million effective January 1, 1987.[5] The PUC also ordered GTE to refund $140 million to its customers by credits on future bills. When the PUC determined GTE's reasonable and necessary operating expenses, it considered, among other things, GTE's federal income tax liability. In calculating GTE's income tax liability based upon the filing of a consolidated income tax return, the PUC did not include in GTE's tax expense any losses which were suffered by unregulated affiliated companies. In addition, the PUC did not reduce GTE's federal income tax liability by including tax deductions taken for GTE's expenses which the PUC could not consider for ratemaking purposes under section 41(c)(3) of PURA. The PUC also included certain payments by GTE to affiliated companies in GTE's reasonable and necessary operating expenses.[6] On appeal, the trial court rendered judgment reversing that portion of the PUC's order which retroactively reduced the rates for GTE prior to February 23, 1989. The trial court determined that neither sections 42 nor 43(f) of PURA authorized the retroactive reduction of final approved rates. The trial court affirmed the remainder of the PUC's order. The court of appeals affirmed in part and reversed in part, holding that PURA does not authorize the PUC to make its new rates effective at a date earlier than the date of the order fixing those rates, that the PUC erroneously calculated GTE's federal income tax liability in estimating its operating expenses, and that the PUC's findings of fact were not sufficient to support its determination that payments by GTE to certain affiliated companies were reasonable and necessary operating expenses. 833 S.W.2d 153.

II.

RETROACTIVE EFFECTIVE DATE OF RATES
The PUC argues that it has the authority to make GTE's new rates effective on a date prior to the issuance of the final rate order. Under the circumstances present in this case, we disagree.
This case involves ratemaking proceedings over which the PUC has exclusive original jurisdiction under sections 42 and 43 of PURA. Section 42 sets forth the procedure for the PUC"on its own motion or on complaint *405 by any affected person"to review a utility's existing rates. After notice and hearing, if the PUC finds the utility's rates to be unreasonable or in violation of any provision of law, the PUC will determine the just and reasonable rates to be charged by the utility by an order which is served upon the utility. These rates are "to be thereafter observed and in force ... and such rates shall constitute the legal rates of the public utility until changed as provided in this Act." TEX.REV.CIV.STAT. art. 1446c, § 42.
Section 43 sets forth the required procedure for a utility to change its existing rates. The utility must file a statement of intent to change its rates with the PUC at least 35 days before the effective date of the proposed change. TEX.REV.CIV.STAT. art. 1446c, § 43(a). If the proposed rate change constitutes a "major change," if any affected person complains or if the PUC so desires, the PUC may conduct hearings to determine the propriety of the change. TEX.REV.CIV.STAT. art. 1446c, § 43(b) & (c). "Pending the hearing and decision," the PUC may suspend the effective date of the utility's proposed rate change up to 150 days after the date on which the proposed rate change would otherwise go into effect. The suspension period will be extended two days for each day of actual hearing on the merits of the proposed rate change that exceeds 15 days. If the PUC suspends the proposed rate change, the utility's existing rates continue in effect unless the PUC fixes temporary rates in lieu of the existing rates. TEX.REV.CIV.STAT. art. 1446c, § 43(d). If the PUC fails to make its final determination of rates "prior to expiration of the period or periods of suspension," the proposed rate change shall be considered approved by the PUC. However, "[t]his approval is subject to the authority of the ... [PUC] to continue a hearing in progress." TEX.REV.CIV.STAT. art. 1446c, § 43(d).[7] If the 150 day suspension period is extended and the PUC fails to make its final determination of rates within 150 days from the date that the proposed effective date of the rate change otherwise would have gone into effect, the utility may implement a changed rate up to, but not exceeding, the proposed rate, provided the utility files and the PUC approves a bond to secure the utility's obligation to refund (or credit against future bills) all sums collected during the period of suspension over and above the rate finally determined by the PUC. TEX.REV.CIV.STAT. art. 1446c, § 43(e). After the hearing, if the PUC finds the proposed rates to be unreasonable or in violation of any provision of law, the PUC will determine and fix the rates to be charged by the utility by an order which is served upon the utility. "[T]hese rates are thereafter to be observed until changed, as provided by this Act." TEX.REV. CIV.STAT. art. 1446c, § 43(f).
These procedures are designed, in part, to compensate a utility for "regulatory lag." See Railroad Comm'n v. Lone Star Gas Co., 656 S.W.2d 421, 426 (Tex.1983). "Regulatory lag" is that period of time between the utility's filing of a statement of intent to change rates and the PUC's issuance of a final rate order.[8] Section 42 includes no provisions which authorize the PUC to set a retroactive effective date for a *406 rate change and does not include any procedures to avoid regulatory lag. However, section 43 limits the periods of suspension, grants the agency authority to fix temporary rates, and permits the utility to institute its new rates by filing an adequate bond approved by the agency. In addition, the setting of a retroactive effective date for a rate change is also a method of compensating for regulatory lag. However, the setting of a retroactive effective date for a rate change has been characterized as prohibited retroactive ratemaking. See Public Util. Comm'n v. United Fuel Gas Co., 317 U.S. 456, 464, 63 S.Ct. 369, 374, 87 L.Ed. 396 (1943); Stefan H. Krieger, The Ghost of Regulation Past: Current Applications of the Rule Against Retroactive Ratemaking in Public Utility Proceedings, 1991 U.ILL.L.REV. 983, 1009-1012 (1991). "The basic premise underlying the prohibition against retroactive ratemaking is that the setting of utility rates is a legislative function, even if carried out by administrative agency; therefore, utility rates, like any other legislation, generally can have only prospective application and cannot be used to recoup losses or gains incurred under prior legal rates." Texas Ass'n of Long Distance Tel. Co. (TEXALTEL) v. Public Util. Comm'n, 798 S.W.2d 875, 882 (Tex.App.Austin 1990, writ denied).

A. Sections 42 and 43 of PURA
In determining whether the PUC has the authority to make GTE's new rates effective on a date prior to the issuance of the final rate order in this case, we first consider whether sections 42 or 43 of PURA confer such authority upon the PUC.[9] Through the enactment of PURA, the legislature has granted the PUC broad powers in regulating public utilities. See TEX.REV.CIV.STAT. art. 1446c, §§ 2, 16, 18, 37, 38, 89. Section 2 of PURA states:
This Act is enacted to protect the public interest inherent in the rates and services of public utilities.... The purpose of this Act is to establish a comprehensive regulatory system which is adequate to the task of regulating public utilities as defined by this Act, to assure rates, operations, and services which are just and reasonable to the consumers and to the utilities.
TEX.REV.CIV.STAT. art. 1446c, § 2. Section 16 states that the PUC "has the general power to regulate and supervise the business of every public utility within its jurisdiction and to do all things, whether specifically designated in this Act or implied herein, necessary and convenient to the exercise of this power and jurisdiction." TEX.REV.CIV.STAT. art. 1446c, § 16(a). Concerning telecommunications utilities, section 18 provides:
It is the policy of this state to protect the public interest in having adequate and efficient telecommunications service available to all citizens of the state at just, fair, and reasonable rates.... It is the purpose of this section to grant to the commission the authority and the power under this Act to carry out the public policy herein stated.
TEX.REV.CIV.STAT. art. 1446c, § 18(a). Section 37 states that the PUC "is hereby vested with all authority and power of the State of Texas to insure compliance with the obligations of public utilities of this Act. For this purpose the regulatory authority is empowered to fix and regulate rates of public utilities...." TEX.REV.CIV.STAT. art. 1446c, § 37. Section 38 states that "[i]t shall be the duty of the regulatory authority to insure that every rate made, demanded, or received by any public utility ... shall be just and reasonable." TEX.REV.CIV.STAT. art. 1446c, § 38. Section 89 provides that PURA "shall be construed liberally to promote the effectiveness and efficiency of regulation of public utilities to the extent that such construction preserves the validity of this Act and its provisions." TEX.REV.CIV.STAT. art. 1446c, § 89.
However, the PUC is a creature of the legislature and has no inherent authority. Denton County Elec. Co-op v. Public Util. Comm'n, 818 S.W.2d 490, 492 (Tex.App. *407 Texarkana 1991, writ denied). See Texas DHS v. Christian Care Ctrs., 826 S.W.2d 715, 719 (Tex.App.Austin 1992, writ denied). "An agency may exercise only those specific powers that the law confers upon it in clear and express language. As a general rule, the legislature impliedly intends that an agency should have whatever power is reasonably necessary to fulfill a function or perform a duty that the legislature has expressly placed in the agency." Kawasaki Motors v. Motor Vehicle Comm'n, 855 S.W.2d 792, 797 (Tex. App.Austin 1993, writ denied); Texas DHS v. Christian Care Ctrs., 826 S.W.2d at 719. "The agency may not, however, on a theory of necessary implication from a specific power, function, or duty expressly delegated, erect and exercise what really amounts to a new and additional power or one that contradicts the statute, no matter that the new power is viewed as being expedient for administrative purposes." Sexton v. Mount Olivet Cemetery Ass'n, 720 S.W.2d 129, 137-38 (Tex.App.Austin 1986, writ ref'd n.r.e.) (citations and emphasis in original omitted); Kawasaki Motors v. Motor Vehicle Comm'n, 855 S.W.2d at 798.
Reviewing the pertinent sections of PURA, we find that PURA generally confers authority upon the PUC to regulate and supervise public utilities, to fix and regulate rates of public utilities, and to insure rates, operations, and services which are just and reasonable to the consumers and to the utilities. Reviewing section 42, we find no express provisions which authorize the PUC to set a retroactive effective date for GTE's rate change.[10] Reviewing section 43, we find express provisions which authorize the PUC to set a retroactive effective date for GTE's rate change; however, these provisions are not applicable under the circumstances present in this case. Section 43 provides several limited procedures for the PUC to set a retroactive effective date for a rate change.[11] First, under certain circumstances, section 43(e) permits the utility to institute its new rate provided that the utility files and the PUC approves a bond to secure the utility's obligation to refund or credit against future bills all sums collected during the period of suspension over and above the rate finally determined by the PUC. However, GTE did not attempt to institute its new rate by filing a bond. Second, concerning rates of a local exchange company such as GTE, section 43(i) states that if the PUC fails to make its "final determination ... of rates prior to the expiration of the 150-day suspension period, the schedule of rates finally approved by the commission shall become effective and the local exchange company shall be entitled to collect such rates from the date the 150-day suspension expired." However, GTE agreed to extend the 150-day suspension period until February 23, 1989the date of the final order. Third, although technically not a procedure for setting a retroactive effective date for a rate change, under certain circumstances, section 43(d) permits the PUC to fix temporary rates in lieu of existing rates until the PUC makes its final determination of rates. However, in this case, the PUC redesignated GTE's current rates as temporary rates on January 4, 1989.[12]
*408 In determining whether authority for the PUC to set a retroactive effective date for a rate change is implied in PURA, we consider the purpose of setting a retroactive effective date. The setting of a retroactive effective date for a rate change is a method of compensating for regulatory lag. See Railroad Comm'n v. Lone Star Gas Co., 656 S.W.2d at 426. As noted above, section 43 provides a detailed procedure to avoid regulatory lag. As a result, it is not necessary to imply authority in PURA for the PUC to set a retroactive effective date for a rate change. Neither section 42 nor 43 confers implied authority upon the PUC to make GTE's new rates effective on a date prior to the issuance of the final rate order under the circumstances present in this case. See Public Util. Comm'n v. General Tel. Co., 777 S.W.2d 827, 830 (Tex.App.Austin 1989, writ dism'd). Consequently, we conclude that under the circumstances present in this case, the PUC does not have the authority to make GTE's new rates effective on a date prior to the issuance of the final rate order.

B. Railroad Comm'n v. Lone Star Gas Co.

In determining whether the PUC has the authority to make GTE's new rates effective on a date prior to the issuance of the final rate order under the circumstances present in this case, we must also consider Railroad Comm'n v. Lone Star Gas Co., 656 S.W.2d 421 (Tex.1983). In Lone Star, this court discussed the authority of a regulatory agency to determine the effective date of a new rate, stating generally that "[t]he courts of this state have provided that in order to compensate for `regulatory lag,' the Commission in its discretion may make the new rates effective at any date prior to the issuance of the order but following the attachment of the agency's jurisdiction." Id. at 426. However, Lone Star is distinguishable from the present case. Lone Star primarily involved the appellate jurisdiction of the Railroad Commission under section 26 of PURA, although a relatively small portion of the rates at issue were before the Commission under section 43. Lone Star had filed for rate increases with the City of Kaufman, and upon rejection of those rates, Lone Star appealed to the Commission. Lone Star also filed for a rate increase to the "environs" of the City of Kaufman (those living outside the limits of the City). This was filed directly with the Commission, invoking its original jurisdiction under section 43.
In applying Lone Star in this case, we must first recognize that the Commission was exercising its appellate jurisdiction with respect to most of the rates at issue. Just as an appellate court would have the authority to make its judgment effective as of the date of the trial court judgment under review, the Commission had the authority to make rates effective as of a date earlier than its final order.[13] In Lone Star, this court did not discuss the source, if any, of the Commission's authority to make rates under section 43 retroactive. In fact, neither party in Lone Star disputed the PUC's authority under section 43 to make the new rates effective on a date prior to the issuance of the final rate order. Consequently, Lone Star does not stand for the proposition that the PUC has the implied authority under section 43 to make rates effective retroactively.

III.

FEDERAL INCOME TAX LIABILITY
The PUC and GTE argue that the PUC properly calculated GTE's federal income tax liability in determining GTE's reasonable and necessary operating expenses. However, this general issue presents us with two more specific questions. First, whether the PUC was compelled by section 41(c)(2) and/or *409 Public Util. Comm'n v. Houston Lighting & Power Co., 748 S.W.2d 439 (Tex.1987), to include losses of unregulated affiliated companies when determining GTE's "fair share" of a reduction in its federal income tax liability resulting from the filing of a consolidated income tax return? Second, whether the PUC was required to include the income tax deductions actually taken by GTE for expenses disallowed by section 41(c)(3) when determining GTE's federal income tax liability?
It is the PUC's duty "to insure that every rate made, demanded, or received by any public utility ... shall be just and reasonable." Tex.Rev.Civ.Stat. art. 1446c, § 38. "In fixing the rates of a public utility the ... [PUC] shall fix its overall revenues at a level which will permit such utility a reasonable opportunity to earn a reasonable return on its invested capital used and useful in rendering service to the public over and above its reasonable and necessary operating expenses." TEX.REV.CIV.STAT. art. 1446c, § 39(a). One of the "reasonable and necessary operating expenses" which a utility incurs is federal income tax. The calculation of GTE's federal income tax liability is significant because a reduction in its income tax liability reduces its operating expenses which are passed on to consumers in the form of a lower rate.
Section 41(c) of the PURA states that the PUC
shall determine expenses and revenues in a manner consistent with the following:
* * * * * *
(2) Income Taxes. If the public utility is a member of an affiliated group that is eligible to file a consolidated income tax return, and if it is advantageous to the public utility to do so, income taxes shall be computed as though a consolidated return had been so filed and the utility had realized its fair share of the savings resulting from the consolidated return, unless it is shown to the satisfaction of the regulatory authority that it was reasonable to choose not to consolidate returns....
(3) Expenses Disallowed. The regulatory authority shall not consider for ratemaking purposes the following expenses:
(A) legislative advocacy expenses, whether made directly or indirectly, including but not limited to legislative advocacy expenses included in trade association dues;
(B) payments ... made to cover costs of an accident, equipment failure, or negligence at a utility facility owned by a person or governmental body not selling power inside the State of Texas;
(C) Costs of processing a refund or credit ...; or
(D) any expenditure found by the regulatory authority to be unreasonable, unnecessary, or not in the public interest, including but not limited to executive salaries, advertising expenses, legal expenses, and civil penalties or fines....

A. Consolidated Income Tax Returns
The PUC and GTE argue that the PUC was not compelled by section 41(c)(2) to include losses of unregulated affiliated companies when determining GTE's "fair share" of a reduction in its federal income tax liability resulting from the filing of a consolidated income tax return. We agree.
Through the enactment of PURA, the legislature has granted the PUC broad powers and discretion in regulating public utilities. See City of Corpus Christi v. Public Util. Comm'n, 572 S.W.2d 290, 297 (Tex. 1978) ("An administrative agency is created to centralize expertise in a certain regulatory area and, thus, is to be given a large degree of latitude by the courts in the methods by which it accomplishes its regulatory function."); TEX.REV.CIV.STAT. art. 1446c, §§ 2, 16, 18, 37, 38, 89. The PUC's discretion in regulating public utilities extends throughout the ratemaking process. See Southwestern Bell Tel. v. Public Util. Comm'n, 571 S.W.2d 503, 515 (Tex.1978) (PUC has discretion in setting rate of return); Texas Alarm & Signal Ass'n v. Public Util. Comm'n, 603 S.W.2d 766, 772 (Tex.1980) (PUC has discretion to determine the method of rate design); Suburban Util. Corp. v. Public Util. *410 Comm'n, 652 S.W.2d 358, 362 (Tex.1983) ("The PUC's ratemaking power includes the discretion to disallow improper expenses."); Public Util. Comm'n v. AT & T Communications, 777 S.W.2d 363, 366 (Tex.1989) ("As long as the commission addresses the rate considerations set by the Public Utility Regulatory Act, the particular factors and the weight to be given those factors are within the discretion of the commission.").
In this case, GTE's parent company, GTE Corporation, filed a consolidated income tax return on behalf of itself and its subsidiary companies. Under the conditions set out in section 41(c)(2),[14] the PUC is required to calculate GTE's federal income tax liability "as though a consolidated [income tax] return had been ... filed and ... [GTE] had realized its fair share of the savings resulting from the consolidated return...." As a result, the PUC was required to determine GTE's "fair share" of a reduction in its federal income tax liability which resulted from the filing of a consolidated income tax return. However, the language of section 41(c)(2) neither includes nor excludes losses of unregulated affiliated companies. Consequently, the PUC had discretion in determining GTE's "fair share of the savings" and was not compelled by section 41(c)(2) to include losses of unregulated affiliated companies when determining GTE's federal income tax liability.
The PUC and GTE argue that the PUC was not compelled by Public Util. Comm'n v. Houston Lighting & Power Co., 748 S.W.2d 439 (Tex.1987) to include losses of unregulated affiliated companies when determining GTE's "fair share" of a reduction in its federal income tax liability resulting from the filing of a consolidated income tax return. We agree.
In Public Util. Comm'n v. Houston Lighting & Power Co., the PUC disallowed $166 million of expenditures related to a nuclear power project as imprudent. In other words, these expenditures could not be included as operating expenses for ratemaking purposes. "The PUC recognized that HL & P [Houston Lighting & Power] intended to write-off for tax purposes, the $166 million of imprudent ACNP [Allen's Creek Nuclear Project] expenditures. The effect of such a write-off would provide tax savings to HL & P and cause it to bear less than its $166 million share of ACNP. In order to give effect to its ruling that HL & P bear the full burden of these imprudent expenses, the PUC determined that any tax savings derived from a write-off should inure to the benefit of the ratepayers." 748 S.W.2d at 440-41. This court stated:
[T]he PUC asserts that the court of appeals erred as a matter of law by allocating the tax savings attributable to HL & P's write-off of the ACNP disallowed expenses to the utility and its shareholders rather than to the ratepayers. The issue before this court then is whether HL & P can recover from ratepayers a federal income tax expense which it did not incur. The resolution of this issue does not rest upon a determination of whether the disallowed expenses which generated the tax savings have been included in the calculation of the new rate. The question is whether HL & P actually incurred this tax expense.
* * * * * *
[R]atepayers can be held accountable only for those tax expenses that are actually incurred by a utility. Accordingly, when a utility claims federal income tax deductions for all of the expenses it has incurred, the resulting tax savings will necessarily reduce the utility's actual federal income tax expense. This will be the effect regardless of whether the expenses are allowed or disallowed in the calculation of a new rate.
Id. at 441-42 (emphasis in original).[15] This court held "that the tax savings generated from HL & P's imprudent expenses should *411 inure to the benefit of the ratepayers. The utility's rates must reflect the tax liability actually incurred." Id. at 442. See Southern Union Gas v. Railroad Comm'n of Texas, 701 S.W.2d 277, 279 (Tex.App.Austin 1985, writ ref'd n.r.e.).
However, the "actual taxes incurred" language of Public Util. Comm'n v. Houston Lighting & Power Co. cannot be applied literally when determining the income tax liability in a ratemaking case. First, the determination of just and reasonable utility rates is far from a precise process; instead, ratemaking relies substantially upon informed judgment and expertise and utilizes projections and estimates in virtually all areas. The ratemaking process is not capable of being neatly characterized as "actual" or "hypothetical." Ratemaking begins with an historic test year. Although the use of historic data adds some certainty, this does not mean that the process begins with actual cash paid by the utility. Because utilities use accrual accounting, the books and records include certain expensessuch as pension, depreciation and nuclear decommissioning expensesthat are estimated allocations to the period in question. Since the rates are to be charged in the future, the historic test year amounts must be adjusted to more accurately reflect costs which will be incurred in the future. These adjustments include normalizing and prospective adjustments such as removing non-recurring expenses, modifying test year data to reflect the number of customers served at the end of the period and modifying expenses and rate base for known and measurable changes. In addition, the test year results must be separated between interstate and intrastate service. After the appropriate adjustments have been made, the adjusted test year results are further adjusted to produce the return level that the PUC determines to be appropriate. The income tax calculation is no different than other elements of utility ratemaking. Since rate determinations are made using an adjusted test year, the tax expenses will always be a hypothetical amount because the components which produce the calculation of income tax have been adjusted from the test year amounts.
Second, under certain conditions, section 41(c)(2) requires the determination of GTE's "fair share" based upon the filing of a hypothetical consolidated income tax return. "If the public utility is a member of an affiliated group that is eligible to file a consolidated income tax return, and if it is advantageous to the public utility to do so ..." section 41(c)(2) specifically requires the PUC to calculate GTE's federal income tax liability "as though a consolidated [income tax] return had been ... filed and ... [GTE] had realized its fair share of the savings resulting from the consolidated return...." In other words, even if a consolidated income tax return is not filed, under certain conditions, the PUC is required to calculate GTE's federal income tax liability as if a consolidated income tax return had been filedGTE's rates would not reflect the tax liability actually incurred. Consequently, we conclude that Public Util. Comm'n v. Houston Lighting & Power Co. does not compel the PUC to include losses of unregulated affiliated companies when determining GTE's "fair share" of a reduction in its federal income tax liability under section 41(c)(2).

B. Disallowed Expenses
The PUC and GTE argue that the PUC was not required to include the income tax deductions actually taken by GTE for expenses disallowed by section 41(c)(3) when determining GTE's federal income tax liability. We agree.
First, the PUC has neither the power nor the discretion to consider expenses disallowed under section 41(c)(3) for ratemaking purposes. Although the legislature granted the PUC broad powers and discretion in regulating public utilities including the ratemaking process, the legislature specifically limited the PUC's powers and discretion concerning disallowed expenses. Section 41(c)(3) states that the PUC "shall not consider for ratemaking purposes the following expenses ..." which include lobbying expenses and "any expenditure found by the regulatory authority to be unreasonable, unnecessary, or not in the public interest...." The language of section 41(c)(3) is clear and unequivocal.
Second, the "actual taxes incurred" language of Public Util. Comm'n v. Houston *412 Lighting & Power Co. cannot be applied literally when determining the income tax liability in a ratemaking case. For example, a literal application of the "actual taxes incurred" language would require that expenses incurred in providing interstate and unregulated services be included in the determination of income tax liability. In addition, as discussed above, tax expenses will always be a hypothetical amount because the components which produce the calculation of income tax have been adjusted from the test year amounts. Third, Public Util. Comm'n v. Houston Lighting & Power Co. considered only the costs related to a nuclear power project which costs were found to be imprudent. No disallowed operating expenses were addressed and no indication was given that this court considered whether the general statements concerning the "actual taxes incurred" would under all circumstances require the PUC to include all expenses when determining the income tax liability in a ratemaking case. In fact, Public Util. Comm'n v. Houston Lighting & Power Co. did not address or even consider the current version of section 41(c)(3)[16] or statutorily disallowed expenses. Consequently, we conclude that the PUC was not required to include the income tax deductions actually taken by GTE for expenses disallowed by section 41(c)(3) when determining GTE's federal income tax liability. To the extent that they conflict with this opinion, we disapprove Southern Union Gas v. Railroad Comm'n of Texas, 701 S.W.2d 277 (Tex.App.Austin 1985, writ ref'd n.r.e.) and City of Somerville v. Public Util. Comm'n, 865 S.W.2d 557 (Tex.App. Austin 1993, no writ).

IV.

PAYMENTS BY GTE TO AFFILIATED COMPANIES
The PUC and GTE argue that the PUC's findings of fact were sufficient to support its determination that certain payments by GTE to affiliated companiesspecifically GTE Service Corporation and GTE Directories were reasonable and necessary operating expenses. We agree concerning payments to GTE Service Corporation, but we disagree concerning payments to GTE Directories.
One of a utility's "reasonable and necessary operating expenses" may include payments to affiliated companies. Section 41(c) of the PURA states that the PUC
shall determine expenses and revenues in a manner consistent with the following:
(1) Transactions with Affiliated Interests. Payments to affiliated interests for costs of any services, or any property, right or thing, or for interest expense shall not be allowed either as capital cost or as expense except to the extent that the regulatory authority shall find such payment to be reasonable and necessary for each item or class of items as determined by the commission. Any such finding shall include specific findings of the reasonableness and necessity of each item or class of items allowed and a finding that the price to the utility is no higher than prices charged by the supplying affiliate to its other affiliates or divisions for the same item or class of items, or to unaffiliated persons or corporations.
This court has stated that appellate courts have "neither the right nor the authority to lay out a precise form of findings to be made by the Commission." Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc., 665 S.W.2d 446, 452 (Tex.1984). Furthermore, this court has consistently stated that appellate courts are "not [to] subject an agency's order to some `hypertechnical standard of review'" concerning the sufficiency of findings of fact. Goeke v. Houston Lighting *413 & Power Co., 797 S.W.2d 12, 15 (Tex. 1990); State Banking Board v. Allied Bank Marble Falls, 748 S.W.2d 447, 448-49 (Tex. 1988). "What is important is that the findings serve the overall purpose evident in the requirement that they be madei.e., they should inform the parties and the courts of the basis for the agency's decision so that the parties may intelligently prepare an appeal and so that the courts may properly exercise their function of review." Goeke v. Houston Lighting & Power Co., 797 S.W.2d at 15. See Texas Health Facilities Comm'n v. Charter MedicalDallas, Inc., 665 S.W.2d at 452. See generally Hume Cofer, Judicial Review of Agency Law Decisions on Scope of Agency Authority, 42 BAYLOR L.REV. 255, 283-85 (1990). "The reviewing court, in determining whether the administrative agency has adequately articulated its findings of fact and conclusions of law, is to give appropriate consideration to such statements in the reports that were adopted by the commission in its final order." Public Util. Comm'n v. AT & T Communications, 777 S.W.2d 363, 366 (Tex.1989).
Although appellate courts do not have the authority to impose a precise form of findings of fact to be made by the PUC, the legislature does have such authority and it exercised that authority concerning payments to affiliated companies. In section 41(c)(1), the legislature required that each finding by the PUC that a payment to an affiliate is "reasonable and necessary for each item or class of items" must include specific findings (1) that each item or class of items allowed is reasonable and necessary and (2) that the price paid by the utility "is no higher than prices charged by the supplying affiliate to its other affiliates or divisions for the same items or class of items, or to unaffiliated persons or corporations." See generally Railroad Comm'n v. Rio Grande Valley Gas Co., 683 S.W.2d 783, 785-87 (Tex. App.Austin 1984, no writ).

A. GTE Service Corporation
GTE Service Corporation is a subsidiary of GTE Corporation. Among other things, GTE Service Corporation provides planning, support and centralized service functions related to telephone operations and home-office functions for all GTE Corporation subsidiaries such as consolidation accounting, tax return filing and treasury functions. GTE pays GTE Service Corporation for these services. The PUC included GTE's payments to GTE Service Corporation in GTE's operating expenses. The PUC's final order included Finding of Fact 13 which stated:
GTE Service Corp provides to GTE Southwest [GTE] the classes of services described in section III.D.3.a of the [Examiner's] Report.[17] The testimony of the GTE witnesses summarized in section III.D.3 of the Report established by a preponderance of the evidence that (1) the allocation formula properly reflects differences between the purchasing affiliates; (2) the prices charged for each class of service are reasonable relative to the cost of obtaining them from alternative sources; and (3) the services are reasonable and necessary for the provision of utility service. The testimony of Mr. Gillespie establishes that $258,000 should be deducted as a disallowance of legislative advocacy expenses and $268,000 should be deducted for Signaling System 7, which is related to services that are not being provided.
*414 (Footnote added). Section III.D.3 of the Examiner's Report[18] stated in pertinent part:
d. GTE Southwest's [GTE's] position. GTE witness Quentin Bredeweg, an employee of GTE Service Corp, explained the rationale for allocating the costs of GTE Service Corp to GTE Southwest [GTE] and the other GTE subsidiaries. In his opinion, the method based on the general allocation rule is nonarbitrary and consistently applied.
With respect to the different treatment for the nontelephone companies and the nondomestic telephone companies, Mr. Bredeweg testified that there are significant differences between the domestic telephone companies and the other companies, so it would not be proper to use the same rule for the other companies. For example, the nontelephone operating companies are too dissimilar to use the general application rule. By contrast, the domestic telephone companies are very homogeneous. Mr. Bredeweg noted also that for certain services, such as auditing, direct billing is more accurate than allocation, and for such services, the subsidiary companies are billed directly.
* * * * * *
GTE witness Thomas Flaherty, a partner in Touch[e] Ross & Co., testified about the cost studies he had conducted to assess the reasonableness of the GTE Service Corp costs allocated to GTE Southwest [GTE]. According to Mr. Flaherty, the vast majority of the functions performed by GTE Service Corp are nondiscretionary, fundamental activities for a large telecommunications company; they are therefore necessary. Mr. Flaherty's two major conclusions with respect to the reasonableness of the charges were: One, if GTE Southwest [GTE] performed the functions in-house, it would incur almost $40 million to accomplish what it obtains from GTE Service Corp for a total of $20.4 million (the amount includes charges related to GTE labs). Two, for the functions that could be performed by outside contractors, it would cost GTE Southwest [GTE] about $11.9 million to obtain them from the outside; GTE Southwest [GTE] could perform these functions in-house for about $6.1 million.
GTE witness Scott Hanle, financial vice president and treasurer for GTE Southwest [GTE], described the process by which the GTE telephone companies guide the activities and monitor the services of GTE Service Corp. The control is exerted both formally through management committees and informally through continual meetings and communications. In Mr. Hanle's opinion, GTE Southwest [GTE] adequately monitors and influences the GTE Service Corp services it receives and is billed for.
e. Discussion and recommendation.

* * * * * *
The ALJ [Administrative Law Judge] agrees with the GTE witnesses and believes that their testimony adequately supports the allocation method as required by the Rio Grande [Railroad Comm'n v. Rio Grande Valley Gas Co., 683 S.W.2d 783 (Tex.App.Austin 1984, no writ)] court. The court did not require that the same allocation rule be used for all affiliates, but rather that any differences be explained. Mr. Bredeweg[`s] testimony more than adequately supports the differential treatment of the affiliates; indeed, his testimony demonstrates that under the circumstances, any allocation method that did not allow for the differences among the affiliates would be open to challenge. Accordingly, Mr. Bredeweg's testimony establishes that the prices charged to GTE Southwest [GTE] were no higher than prices charged to the other subsidiaries.
Mr. Flaherty's testimony established that the prices charged are reasonable relative to the cost of obtaining them from alternative sources. His testimony and that of Mr. Hanle established that the services obtained were necessary. Finally, Mr. Moffatt's audit determined that the *415 allocated amounts reasonably approximate the actual costs of the services received.
There remains the testimony of Mr. Gillespie that the allocated amounts may include unallowable expenses and expenses that may be recovered when Signaling System 7 is placed in service. The ALJ therefore recommends that the Commission adopt Mr. Gillespie's alternative recommendation, which would allow the requested amount of GTE Service Corp expenses allocated to GTE Southwest [GTE], but would deduct $258,000 of legislative advocacy costs and $268,000 of Signaling System 7 costs....
Finding of Fact 13 and section III.D.3 of the Examiner's Report which was adopted and incorporated by reference in the PUC's final order state that (1) "the prices charged for each class of service are reasonable relative to the cost of obtaining them from alternative sources," (2) "the services are reasonable and necessary for the provision of utility service," (3) "the prices charged to GTE Southwest [GTE] were no higher than prices charged to the other subsidiaries," (4) "the prices charged are reasonable relative to the cost of obtaining them from alternative sources," (5) "the services obtained were necessary," and (6) "the allocated amounts reasonably approximate the actual costs of the services received." Although the finding of fact as supplemented by the Examiner's Report is not in the exact form stated in section 41(c)(1), it constitutes sufficient findings (1) that each item or class of items allowed is reasonable and necessary and (2) that the price paid by GTE "is no higher than prices charged by the supplying affiliate to its other affiliates or divisions for the same items or class of items, or to unaffiliated persons or corporations." Consequently, we conclude that the PUC's finding of fact as supplemented by the Examiner's Report was sufficient to support its determination that payments by GTE to GTE Service Corporation were reasonable and necessary operating expenses.

B. GTE Directories
GTE Directories is a subsidiary of GTE Corporation. GTE Directories publishes and prints directories for the GTE telephone companies and unaffiliated telephone companies. Under a joint venture agreement between GTE and GTE Directories, GTE Directories publishes and prints GTE's subscriber directories for the right to sell yellow page advertising to the business subscribers and GTE provides the subscriber listings and bills and collects the yellow page advertising revenues. As payment for the listings, and the billing and collection, GTE retained 52.5% of the revenues it collects and GTE Directories received 47.5% of the revenues. The PUC included GTE's payments to GTE Directories of 47.5% of the revenues in GTE's operating expenses.[19] The PUC's final order included Finding of Fact 16 which stated:
The testimony of GTE witness Keys refutes the conclusion that GTE Directories' agreement with GTE Southwest [GTE] is unfavorable in comparison with its other customers. It would not be appropriate to adjust GTE Directories' prices for return and tax components. Because the matching principle would require ignoring the revenues from the arrangement with GTE Directories if the expenses are not allowed, the customers benefit from recognizing the arrangement for rate-making purposes. Accordingly, expenses of $19,400,000 and revenues of $47,416,000 should be included in the cost of service.
Section III.D.6 of the Examiner's Report stated in pertinent part:
e. Discussion and recommendation. The ALJ [Administrative Law Judge] disagrees with the company's [GTE's] position [that payments to GTE Directories are not an expense subject section 41(c)(1)]; the expenses incurred as a result of the agreement with GTE Directories are subject to scrutiny as an affiliate transaction. The ALJ agrees with the General Counsel and staff, however, that the expenses should be allowed because disallowance would cause a net reduction *416 of revenues. Adopting Mr. Arndt's [a witness for Intervenors/Cities] recommendation of disallowing all the expense would require not recognizing the revenues.
The ALJ agrees with the direct and rebuttal testimony of GTE Southwest [GTE] witness Keys that Mr. Arndt's analysis does not demonstrate that GTE Directories' agreement with GTE Southwest [GTE] is unfavorable in comparison with its other customers. With respect to Mr. Allen's [a witness for Intervenor Office of Public Utility Counsel] recommendation, the ALJ is of the opinion that it is not appropriate to adjust an affiliate's prices for return and tax components on the basis of the assumptionmade by Mr. Allen that such components would be adjusted if the utility were providing the services for itself.
Accordingly, the ALJ recommends that the Commission allow in cost of service $19,940,000 of expenses associated with the directories; $47,416,000 of revenues should be recognized.
Finding of Fact 16 and section III.D.6 of the Examiner's Report which was adopted and incorporated by reference in the PUC's final order state that (1) the "testimony of GTE witness Keys refutes the conclusion that GTE Directories' agreement with GTE Southwest [GTE] is unfavorable in comparison with its other customers," (2) GTE's "customers benefit from recognizing the [joint venture] arrangement [between GTE and GTE Directories] for rate-making purposes" and (3) the "analysis [of a witness for Intervenors/Cities] does not demonstrate that GTE Directories' agreement with GTE Southwest [GTE] is unfavorable in comparison with its other customers." The finding of fact is missing at least one essential finding required by section 41(c)(1)that each item or class of items allowed is reasonable and necessary. Consequently, we conclude that the PUC's finding of fact as supplemented by the Examiner's Report was not sufficient to support its determination that payments by GTE to GTE Directories were reasonable and necessary operating expenses.

V.
In summary, we conclude that under the circumstances present in this case, the PUC does not have the authority to make GTE's new rates effective on a date prior to the issuance of the final rate order, that the PUC was not compelled by section 41(c)(2) or Public Util. Comm'n v. Houston Lighting & Power Co., 748 S.W.2d 439 (Tex.1987), to include losses of unregulated affiliated companies when determining GTE's "fair share" of a reduction in its federal income tax liability resulting from the filing of a consolidated income tax return, that the PUC was not required to include the income tax deductions actually taken by GTE for expenses disallowed by section 41(c)(3) when determining GTE's federal income tax liability, that the PUC's finding of fact as supplemented by the Examiner's Report was sufficient to support its determination that payments by GTE to GTE Service Corporation were reasonable and necessary operating expenses and that the PUC's finding of fact as supplemented by the Examiner's Report was not sufficient to support its determination that payments by GTE to GTE Directories were reasonable and necessary operating expenses. Consequently, the judgment of the court of appeals is reversed in part and affirmed in part and the cause is remanded to the trial court with instructions that it be remanded to the PUC for further proceedings consistent with our opinion.[20]
*417 GONZALEZ, J., concurs in part and dissents in part and is joined by GAMMAGE, J.
SPECTOR, J., dissents.
GONZALEZ, Justice, joined by GAMMAGE, Justice, concurring in part and dissenting in part.
I concur with the Court's holding today that under the circumstances of this case the PUC lacked retroactive ratemaking authority. However, because the Court also approves a calculation of GTE's tax liability that may result in ratepayers reimbursing GTE for taxes that the utility will never actually pay, I dissent in part. In so doing, the Court misconstrues section 41(c)(2) of PURA[1] and our precedent. I thus concur in Parts I, II, and IV of the Court's opinion, and in the corresponding portion of Part V, but dissent from Part III.
The Court's opinion fairly states the facts giving rise to the issue of retroactive ratemaking. Additionally, however, the facts were that to determine GTE's reasonable and necessary operating expenses for ratemaking purposes, the PUC considered GTE's federal income tax liability. GTE Corporation is the parent company of the utility. GTE Corporation filed consolidated income tax returns for GTE and unregulated affiliated companies. When the affiliated entities lost money, the consolidated returns reflected the losses as tax deductions. Consequently, the consolidated returns showed a lower tax liability for GTE Corporation's companies than they would have had without the tax deductions due to losses. In determining GTE's reasonable and necessary operating expenses, the PUC did not consider these tax deductions when calculating GTE's "fair share" of income tax liability. In effect, the PUC calculated GTE's fair share of tax liability under the consolidated returns as if GTE had filed separate returns without any deductions. The trial court and a majority of this Court approve the PUC's approach in calculating GTE's tax liability. I disagree with this part of the Court's opinion. I think the court of appeals correctly held that the PUC erred in omitting consideration of the tax deductions in the consolidated returns when it calculated GTE's federal income tax liability. 833 S.W.2d 153, 163-69.
The PUC argues that it could ignore tax savings realized in consolidated returns filed by GTE Corporation and tax deductions that GTE took for expenses that section 41(c)(3) of PURA disallows from ratemaking. I disagree, and dissent from that part of the Court's opinion that approves the PUC's treatment of GTE's tax savings. This approach overlooks the language of section 41(c)(2) of PURA,[2] is contrary to Public Util. Comm'n v. Houston Lighting & Power Co., 748 S.W.2d 439 (Tex.1987) (HL & P), appeal dismissed, 488 U.S. 805, 109 S.Ct. 36, 102 L.Ed.2d 16 (1988), and unfairly requires ratepayers to reimburse GTE for taxes it will never actually pay.
The PUC must balance two goals. It must ensure that GTE charges customers just and reasonable rates and that GTE's revenues generate a reasonable return for the utility above reasonable and necessary operating expenses. TEX.REV.CIV.STAT. art. 1446c, §§ 38, 39(a) (Vernon Supp.1995). PURA's formula for striking the balance is that a utility's expenses, plus a reasonable return, should equal a just and reasonable customer rate. This formula links the two concerns together. Therefore, customer service rates ought to reflect an increase or decrease in a utility's expenses. If GTE's expenses decrease, customer service rates should fall.
Customers must pay for a utility's tax liability as an expense. HL & P, 748 S.W.2d at 441. Section 41(c)(2) of PURA addresses the special situation when a utility files consolidated returns with its unregulated affiliated companies. The section states:
If a public utility is a member of an affiliated group that is eligible to file a consolidated *418 income tax return, and if it is advantageous to the public utility to do so, income taxes shall be computed as though a consolidated return had been so filed and the utility had realized its fair share of the savings resulting from the consolidated return, unless it is shown to the satisfaction of the regulatory authority that it was reasonable to choose not to consolidate returns.
TEX.REV.CIV.STAT. art. 1446c, § 41(c)(2) (Vernon Supp.1995) (emphasis added). The PUC failed to apply this section properly when it calculated GTE's tax expense liability. The PUC computed the utility's income taxes as though GTE filed separate returns, and did not attempt to apportion to GTE its fair share of tax savings realized in GTE Corporation's consolidated returns.
The PUC did not correctly construe section 41(c)(2). The Court today defers to the PUC on the ground that the PUC has great discretion in the ratemaking process. Such reasoning is persuasive only as a basis to avoid analyzing the meaning of section 41(c)(2). The PUC has no greater expertise than this Court in construing statutory meaning. Section 41(c)(2) requires the PUC to fairly allocate to GTE the savings that result from filing consolidated returns with its affiliated companies. In fact, even if GTE did not file consolidated returns, the section would require the PUC to allocate theoretical savings. Section 41(c)(2) plainly states that a public utility should share in all savings realized from a consolidated return. Therefore, I construe section 41(c)(2) as requiring that the PUC determine the utility's fair share of the tax savings.
Subsection (3) of section 41(c) provides no basis for the PUC to exclude savings realized in the consolidated returns from its calculation of GTE's tax liability. That section directs the PUC to disallow four categories of expenses. See TEX.REV.CIV.STAT. art. 1446c, § 41(c)(3)(A)-(D) (Vernon Supp.1995). In other words, a utility cannot make customers pay for these expenses. None of the four categories disallow the PUC from considering savings that a utility realizes by filing consolidated returns.[3]
In addition, HL & P compels the PUC to determine the fair share of actual tax savings due to filing consolidated returns and due to tax deductions. See 748 S.W.2d at 441 & n. 1 (discussing Federal Power Comm'n v. United Gas Pipe Line Co., 386 U.S. 237, 87 S.Ct. 1003, 18 L.Ed.2d 18 (1967)). HL & P held that a "utility's rates must reflect the tax liability actually incurred." Id. at 442. In the usual ratemaking context, this statement means that the PUC must evaluate historical data on a utility's actual tax liability when it sets the future rates. The PUC did not follow this rule. By not considering the savings GTE realized by filing consolidated returns, the PUC measured the expense of GTE's tax liability as if GTE had filed separate returns. Likewise, by not considering GTE's tax deductions for lobbying, advertising, and other expenses disallowed for ratemaking purposes by section 41(c)(3) of PURA,[4] the PUC measured GTE's tax liability as if GTE had not taken these deductions. Although the PUC must disallow these expenses in calculating the rate base, it does not follow that the PUC can overlook the tax deductions that GTE takes for them. HL & P makes this point:
[R]atepayers can be held accountable only for those tax expenses that are actually incurred by a utility. Accordingly, when a utility claims federal income tax deductions... the resulting tax savings will necessarily reduce the utility's actual federal income tax expense. This will be the effect whether the expenses are allowed or disallowed in the calculation of a new rate. *419 748 S.W.2d at 442. The PUC's approach violates HL & P's directive. As a result, GTE is passing on to consumers a hypothetical tax expense. The PUC should not require ratepayers to pay phantom taxes in lieu of a reasonable estimate of actual tax expense based on past years' data. See id. at 441 n. 1 (summarizing Federal Power, 386 U.S. at 246-47, 87 S.Ct. at 1008-09); Washington Gas Light Co. v. Public Serv. Comm'n, 450 A.2d 1187, 1234-35 (D.C.1982)) (approving a utility commission's rate calculation in which it halved the utility's tax liability expense estimate, based on savings in the consolidated tax return due to losses at an unregulated subsidiary company).
The majority's attempt to distinguish HL & P, a ratemaking case, from the present ratemaking case is unpersuasive. The majority says the rate order under review differs from that in HL & P because the PUC must base GTE's rates on test year results, estimated income tax calculations, and hypothetical returns. The majority's distinction is illusory. After we remanded in HL & P, the PUC likely used the same kind of information to set Houston Lighting & Power's service rates. Furthermore, the difficulty of prospective ratemaking is not a sufficient reason to omit a portion of the analysis, for example, inquiry into a utility's fair share of tax savings under consolidated returns or its tax deductions. It is the PUC's role to handle these complexities. The amounts of GTE's fair share of tax savings and GTE's tax deductions are questions of fact for the PUC's determination. In calculating GTE's expenses for ratemaking purposes, HL & P requires that the PUC take into account the tax savings realized in the consolidated returns and tax deductions, including those taken for expenses disallowed by section 41(c)(3). I stand by our holding in HL & P, that actual tax savings "should inure to the benefit of the ratepayers." 748 S.W.2d at 442.
Given the directives of section 41(c)(2) and HL & P, 748 S.W.2d at 441-42, the PUC erred by failing to allocate to GTE a fair share of the tax savings realized in the consolidated returns when it calculated the service rates, and excluding tax deductions that GTE took in its income tax returns. As a result, the PUC's estimate of GTE's tax liability is artificially high. No longer is there a balance between customers' rates and GTE's reasonable return above actual operating expenses. To charge ratepayers for a tax expense that may be more than GTE actually ever will pay is not just and reasonable. By contrast, allocating a fair share of tax savings to GTE and recognizing GTE's tax deductions would benefit consumers in the form of lower rates without reducing the net return for GTE or its investors. To put it in terms of PURA's formula, GTE's lower expenses due to actual reductions in tax liability, plus an unaltered reasonable rate of return, should equal a lower customer rate.
For these reasons, I concur in the Court's disapproval of the PUC's retroactive ratemaking under the facts of this case. However, I dissent from the Court's approval of the PUC's treatment of GTE's tax liability. On the latter issue, I would affirm the judgment of the court of appeals, 833 S.W.2d at 168-69, and hold that a regulatory agency must consider actual tax liability that results when a utility files consolidated income tax returns and takes tax deductions.
SPECTOR, Justice, dissenting.
I disagree with the majority's holdings that allow utilities to unjustly charge consumers for "phantom taxes." For the reasons stated in Justice Gonzalez's concurring and dissenting opinion, I would adhere to this Court's opinion in Public Utility Commission v. Houston Lighting & Power Co., 748 S.W.2d 439 (Tex.1987), as well as the other decisions the majority today overturns: City of Somerville v. Public Utility Commission, 865 S.W.2d 557 (Tex.App.Austin 1993, no writ) and Southern Union Gas Co. v. Railroad Commission, 701 S.W.2d 277 (Tex.App.Austin 1985, writ ref'd n.r.e.). I would thus hold that the Public Utility Commission erred by failing to account for (1) GTE's pro-rata share of the savings resulting from its parent's filing a consolidated tax return; and (2) the income tax deductions taken for expenses that were disallowed from inclusion in rate base.
*420 I also differ with the majority's curtailment of the Commission's authority to set the effective date of its ratemaking order. This Court has squarely held that the Commission has considerable discretion in this regard:
The courts of this state have provided that in order to compensate for `regulatory lag,' the Commission in its discretion may make the new rates effective at any date prior to the issuance of the order but following the attachment of the agency's discretion.
Railroad Comm'n v. Lone Star Gas Co., 656 S.W.2d 421, 426 (1983). I do not believe this writing is "distinguishable," as the majority declares, supra at 408. The Lone Star opinion addresses the present issue fully, discussing authority from other jurisdictions as well as Texas, and unambiguously concludes that the Commission has discretion to make its new rates effective at a date prior to the issuance of its final order. 656 S.W.2d at 425-26.
The majority's holding is also inconsistent with the Court's more recent writing in this area. In State v. Public Utility Commission, 883 S.W.2d 190, 195-96 (Tex.1994), this Court held that the Commission has broad discretion to provide remedies for regulatory lag other than those provided in section 43, because that section is simply "a component of the overall scheme provided by PURA for regulating utilities and assuring that rates are just and reasonable." Today, however when the Commission's exercise of its discretion benefits consumers rather than utilitiesthe majority holds that the Commission has no such discretion at all, because section 43 already "provides a detailed procedure to avoid regulatory lag." Supra at 408.
While I disagreed with much of the Court's writing in State v. PUC, I recognize that it is now the law. Thus, under both Lone Star and State v. PUC, I would hold that the Commission acted within its discretion when it provided consumers some relief from regulatory lag "in order to do equity in light of [GTE's] dilatory tactics ... in this case." By overturning this exercise of discretion, the majority allows GTE to retain a windfall of some $140 million in overcharges.[1]
I would affirm the judgment of the court of appeals in all respects except with regard to the effective date of the Commission's order. Accordingly, I dissent.
NOTES
[1] The PUC made limited modifications to the February 23, 1989 order in its Order on Rehearing issued on April 7, 1989.
[2] Tex.Rev.Civ.Stat. art. 1446c, § 3(c), (v).
[3] Apparently this proceeding was filed under section 42.
[4] Apparently on January 4, 1989, the PUC redesignated GTE's current rates as temporary rates.
[5] In amended finding of fact 11 of its order on rehearing dated April 7, 1989, the PUC clarified the reasons why it made GTE's new rates effective January 1, 1987:

The record in this case establishes that GTE Southwest's new rates should be made effective January 1, 1987, in part because the gross receipts taxes and federal income taxes embedded in the company's rates were at higher levels than the company actually paid since that date and because of the facts stated in FF 10 and also in order to do equity in light of the dilatory tactics of GTE Southwest in this case.
[6] The calculation of GTE's reasonable and necessary operating expenses is significant because a reduction in its operating expenses is passed on to consumers in the form of a lower rate.
[7] Concerning the rates of a local exchange company such as GTE, if the PUC fails to make its "final determination ... of rates prior to the expiration of the 150-day suspension period, the schedule of rates finally approved by the commission shall become effective and the local exchange company shall be entitled to collect such rates from the date the 150-day suspension expired." However, "[a]ny surcharges or other charges necessary to effectuate this subsection shall not be recovered over a period of less than 90 days from the date of the commission's final order." Tex.Rev.Civ.Stat. art. 1446c, § 43(i).
[8] In State v. Public Util. Comm'n, 883 S.W.2d 190, 197 (Tex.1994), this court determined that the PUC has the authority under PURA to permit a public utility to defer post-in-service costs incurred during the regulatory lag period in order to protect the utility's financial integrity. "[I]f the effects of regulatory lag infringe on the Commission's ability to regulate in a manner necessary to carry out the provisions of PURA, then the Commission may respond within its powers, both express and implied, under PURA to alleviate the impact of regulatory lag in order to fulfill its statutorily imposed duties." Id. at 196. In addition, this court determined that the deferral of post-in-service costs did not violate any general prohibition against retroactive ratemaking. Id. at 199. See Office of Public Util. Counsel v. Public Util. Comm'n, 888 S.W.2d 804, 807-08 (Tex.1994); City of El Paso v. Public Util. Comm'n, 883 S.W.2d 179, 187 (Tex.1994).
[9] In conclusion of law 6 in its final order, the PUC stated:

Pursuant to section 42 [of PURA], the Commission may make the new rates in this case effective as early as February 27, 1984, the date of the General Counsel's answer. Pursuant to section 43 [of PURA], the Commission may make the new rates in this case effective as early as June 1, 1988, the date of GTE Southwest's second application.
[10] In fact, section 42 provides that following the hearing, the PUC "shall determine the just and reasonable rates ... to be thereafter observed...." Tex.Rev.Civ.Stat. art. 1446c, § 42 (emphasis added).
[11] In addition, under section 43, unless one of the provisions which addresses retroactivity applies, and if the PUC finds the proposed new rate is unreasonable or violates the law, the PUC sets the rate which is "thereafter to be observed until changed...." Tex.Rev.Civ.Stat. art. 1446c, § 43(f).
[12] However, the PUC had previously attempted to fix a temporary rate. Effective October 1, 1985, the Tax Code was amended to exclude from the gross receipts tax any sums received by a utility from its sale of telecommunication services. See 1985 Tex.Gen.Laws, ch. 206, § 10, at 793 (since repealed); 1959 Tex.Gen.Laws, 3d C.S., ch. 1, art. 11.06, at 304 (since repealed). In June 1986, pursuant to section 43(d) of PURA, the PUC ordered the examiners to conduct an evidentiary interim rate hearing to determine the dollar amount of GTE's reduced gross receipts tax expense, to determine interim rates based on the amount of reduction in GTE's gross receipts tax expense, and to order interim refunds or credits to GTE's customers. GTE sought injunctive relief in district court in Travis County. After briefing and argument, in December 1986, the district court announced that it would grant injunctive relief. However, the district court never issued an injunction and the PUC made no further attempts to implement an interim rate reduction based upon GTE's reduced gross receipts tax expense.
[13] When Lone Star was decided, section 26, granting appellate jurisdiction to the Commission, provided that the final order "shall fix such rates as the municipality should have fixed in the ordinance from which the appeal was taken." Tex.Rev.Civ.Stat. art. 1446c, § 26(e) (Vernon 1980). Although the court did not refer to or rely upon this provision, it could be construed to give the Commission the authority to make the rates effective retroactively. Section 26(e) has since been amended to prohibit such a result. Section 26(e) is now section 26(g) and the following has been added: "Any rate, whether temporary or permanent, set by the commission, shall be prospective and observed from and after the applicable order of the commission, except interim rate orders necessary to effect uniform system-wide rates."
[14] It is not disputed that filing a consolidated tax return was advantageous to GTE.
[15] This has sometimes been described as the "actual taxes paid doctrine." See Cities of Abilene v. Public Util. Comm'n, 854 S.W.2d 932, 944-45 (Tex.App.Austin 1993, writ pending); City of Somerville v. Public Util. Comm'n, 865 S.W.2d 557, 563 (Tex.App.Austin 1993, no writ). See generally Ron Moss, Ratemaking in the Public Utility Commission of Texas, 44 BAYLOR L.REV. 825, 833-43 (1992).
[16] The "shall not consider" language was added to section 41(c)(3) in 1983 after the PUC had made the decision in Public Util. Comm'n v. Houston Lighting & Power Co. Prior to 1983, section 41(c)(3) provided only that the PUC had discretionary authority to "promulgate reasonable rules and regulations with respect to the allowance or disallowance of certain expenses for ratemaking purposes." In Public Util. Comm'n v. Houston Lighting & Power Co., the PUC exercised "discretionary" authority over capital investment decisions to reduce HL & P's revenue requirements to reflect HL & P's imprudent investment and the resulting tax savings. Under the current version of section 41(c)(3), the PUC would no longer have such discretionary authority.
[17] Section III.D.3.a of the Examiner's Report stated:

a. Introduction.Four GTE witnesses discussed the operations of GTE Service Corp and the allocation and direct billing of its expenses to GTE Southwest [GTE]. About $9,406,000 of GTE Service Corp expenses were allocated to GTE Southwest [GTE].
As described by the witnesses, GTE Service Corp is divided into three groups: Telops, GTE Corporate Departments, and Products and Systems. Telops performs planning, support, and centralized service functions related to telephone operations. The corporate departments perform home-office functions for all GTE companies, such as consolidation accounting, tax return filing and treasury functions. The products and systems group supports nontelephone subsidiaries. In general, the expenses of corporate departments are allocable to all GTE subsidiaries, the expenses of telops are allocable only to telephone operating companies, and the expenses of products and systems are allocable only to nontelephone subsidiaries.
[18] The PUC's final order stated that "[w]ith the exception of the findings and conclusions, the Examiner's Report is ADOPTED and incorporated by reference in this Order ... [subject to several modifications]."
[19] We assume, without deciding, that GTE's payments to GTE Directories of 47.5% of the revenues constitute payments to an affiliate which are subject to section 41(c)(1).
[20] The PUC also argues that the court of appeals erred in not considering and granting its point of error that the trial court erred in denying its pleas to the jurisdiction and motions to strike OPUC's intervention. After entry of the PUC's final order, GTE, AT & T Communications of the Southwest (AT & T), the Cities of Abilene et al. (the Cities) and the Office of Public Utility Counsel (OPUC) filed eleven total petitions in the trial court challenging the PUC's order. The PUC filed pleas to the jurisdiction concerning eight of the appeals filed by GTE, AT & T, the Cities and OPUC. However, the PUC did not contest jurisdiction in three separate appeals filed by GTE, AT & T and the Cities. Regardless of the propriety of the trial court's denial of the pleas to the jurisdiction, the three appeals filed by GTE, AT & T and the Cities were sufficient to vest jurisdiction in the trial court over those three appeals.

Concerning the motions to strike OPUC's intervention, regardless of the propriety of the trial court's denial of the motions, we agree with the court of appeals that "[d]eciding the issue of Public Counsel's [OPUC's] right to intervene was not necessary to the Court's disposition because the Cities raised the same points of error that Public Counsel raised." 833 S.W.2d at 175 n. 24.
[1] Tex.Rev.Civ.Stat. art. 1446c, § 41(c)(2) (Vernon Supp.1995).
[2] Tex.Rev.Civ.Stat. art. 1446c, § 41(c)(3) (Vernon Supp.1995).
[3] The contrary argument is that expenditures by GTE's affiliated companies are "expenses not in the public interest," and thus in a category disallowed from the PUC's ratemaking consideration. See id. § 41(c)(3)(D). Whether section 41(c)(3)(D) of PURA disallows an expense from ratemaking consideration, however, is irrelevant to the PUC's calculation of a utility's tax expense. Section 41(c)(2) directs the PUC to consider the fair share of all savings resulting from consolidated returns.
[4] See Tex.Rev.Civ.Stat. art. 1446c, § 41(c)(3) (Vernon Supp.1995). The effect of section 41(c)(3) is that a utility cannot force consumers to pay for lobbying, advertising, civil penalties or fines, and other expenses that do not benefit the public.
[1] As explained in the court of appeals' opinion, 833 S.W.2d at 170, this windfall resulted after the Texas Legislature excluded telecommunication services from the gross-receipts tax and included them within the scope of the sales tax. GTE thereupon levied a "surcharge" on consumers to collect the sales tax; but it failed to reduce its rates to adjust for the exemption from the gross receipts tax. Thus, consumers continued to pay GTE for the gross-receipts tax, even though GTE was no longer paying the tax.