# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

―――――――――
### NO. 03-06-00585-CV
―――――――――

**Appellants, Cities of Corpus Christi, et al. // Cross-Appellant,
AEP Texas Central Company**

**v.**

**Appellee, Public Utility Commission of Texas // Cross-Appellees,
Cities of Corpus Christi, et al.**

―――――――――
**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-GN-05-004378, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**
―――――――――

## M E M O R A N D U M   O P I N I O N

This is an appeal from a final order of the Public Utility Commission in a ratemaking proceeding initiated by AEP Texas Central Company (TCC) to set transmission and distribution rates. The district court affirmed the Commission's final order. Because we conclude that the Commission's final order was consistent with the plain language of the relevant statutes and was supported by substantial evidence, we affirm the judgment of the district court.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1999, the legislature determined it was in the public interest to restructure and partially deregulate the Texas retail electric power industry. *See generally* Tex. Util. Code Ann. § 39.001 (West 2007). To accomplish this mandate, the legislature enacted Senate Bill 7 ("SB 7"),

which amended the Public Utility Regulatory Act ("PURA").[1] *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2543 (now codified in Chapter 39 of the PURA, Tex. Util. Code Ann. §§ 39.001-.910 (West 2007)); *see also CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coalition of Cities*, No. 03-05-00557-CV, 2007 Tex. App. LEXIS 9919, at *3-*18 (Tex. App.—Austin Dec. 20, 2007, no pet. h.) (describing statutory framework for transition to competitive retail electric market) (hereafter "*CenterPoint*"). SB 7 required each integrated electric utility to separate its business activities into three separate units—a power generation company, a transmission and distribution utility, and a retail electric provider. *See* Tex. Util. Code Ann. § 39.051. After the passage of SB 7, and with few exceptions, only transmission and distribution utilities remain subject to rate regulation by the Commission. *See id.* § 39.001(a).

This appeal arises from the first ratemaking proceeding for TCC[2] since the enactment of SB 7. TCC initiated this ratemaking proceeding on November 3, 2003, when it filed an application with the Commission to increase the transmission and distribution rates for its entire service area.[3] TCC's application sought approval to increase its rates by $66.5 million, or 14.7%, to recover a claimed revenue requirement of $519.9 million.

The Commission referred TCC's application to the State Office of Administrative Hearings for a contested case proceeding. Several parties intervened in the proceedings before

---

[1] Tex. Util. Code Ann. §§ 11.001-64.158 (West 2007).

[2] TCC is the transmission and distribution utility of the formerly integrated utility known as Central Power & Light Company.

[3] TCC serves an area of approximately 44,000 square miles in south Texas.

2

SOAH. Included among the intervenors were the Cities served by TCC,[4] CPL Retail Energy, LP,[5] the Office of Public Utility Counsel (OPC), the State of Texas, and the Texas Industrial Energy Consumers (TIEC).[6] Following a hearing and briefing on all disputed matters, the administrative law judges recommended findings of fact and conclusions of law in a proposal for decision. After the Commission issued two orders remanding the cause to SOAH for additional proceedings, the ALJs issued a PFD on Remand. Ultimately, the Commission held its own hearing on certain issues raised by the parties. Upon considering additional evidence, the Commission adopted in part and rejected in part, the ALJs' recommendations in the original PFD and the PFD on Remand. In its final order, the Commission determined that TCC's appropriate revenue requirement was $443.6 million. This reduction represented an agreed disallowance of $10.5 million in affiliate expenses, plus other disallowances made by the Commission.

TCC, the Cities, and the State sought judicial review of the Commission's final order in district court. *See id.* § 15.001; Tex. Gov't Code Ann. §§ 2001.171, .174, .176 (West 2000). The district court consolidated all of the petitions for judicial review into one cause for purposes of trial. After considering the pleadings, briefs, and argument of the parties, as well as the administrative

---

[4] There were 86 cities served by TCC, including Corpus Christi, Harlingen, Laredo, McAllen, and Victoria. We refer to all 86 cities collectively as the "Cities."

[5] CPL Retail Energy, LP, is the affiliated retail electric provider of the formerly integrated utility known as Central Power & Light Company.

[6] Commission Staff also participated as a party in these proceedings.

record, the district court entered final judgment affirming the Commission's final order in all respects. This appeal followed. Only TCC and the Cities appeal from the district court's final judgment.[7]

**DISCUSSION**

On appeal, TCC and the Cities challenge the district court's judgment affirming the Commission's final order on various grounds. TCC raises three issues. TCC argues that the district court erred in affirming the Commission's final order because the Commission erroneously imposed a $7.5 million penalty reducing TCC's proposed rates after determining that TCC initiated the ratemaking proceeding, erroneously reduced TCC's proposed rates based on an estimate of future costs, and erroneously applied a consolidated tax savings adjustment to reduce TCC's proposed rates. The Cities raise four issues. The Cities argue that the district court erred in affirming the Commission's final order because the Commission violated section 36.058 of the PURA by including affiliated expenses in TCC's rates without making the required statutory findings, erroneously severed service quality and reliability issues into another proceeding and failed to consider TCC's poor service quality when setting TCC's rates, violated section 36.060 of the PURA by allocating only 23.1% of the consolidated tax savings to TCC, and failed to allocate to ratepayers any of the gain realized from the sale of TCC's affiliated retail electric provider.

---

[7] Neither the State nor TIEC appealed the district court's judgment, but TIEC did file a brief in support of the Commission regarding the first issue raised on appeal by TCC.

*Standard of Review*

We review the Commission's final order under the substantial evidence rule. *See* Tex. Util. Code Ann. § 15.001; Tex. Gov't Code Ann. § 2001.174. "This is a limited standard of review that gives significant deference to the agency in its field of expertise." *Railroad Comm'n v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995); *see Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.*, 665 S.W.2d 446, 452 (Tex. 1984). We presume that the agency's order is valid and that its findings, inferences, conclusions, and decisions are supported by substantial evidence. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 185 (Tex. 1994); *Charter Med.*, 665 S.W.2d at 452. The complaining party has the burden to overcome this presumption. *City of El Paso*, 883 S.W.2d at 185; *Hammack v. Public Util. Comm'n*, 131 S.W.3d 713, 725 (Tex. App.—Austin 2004, pet. denied). In conducting a substantial evidence review, we evaluate the entire record to determine whether the evidence, as a whole, is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988); *Suburban Util. Corp. v. Public Util. Comm'n*, 652 S.W.2d 358, 364 (Tex. 1983). We may not substitute our judgment for that of the agency on the weight of the evidence on questions committed to the agency's discretion. Tex. Gov't Code Ann. § 2001.174; *Charter Med.*, 665 S.W.2d at 452; *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied).

Under a substantial evidence review, the issue for the reviewing court is not whether we believe the agency's decision was correct, but whether the record demonstrates some reasonable

5

basis for the agency's action. *Charter Med.*, 665 S.W.2d at 452; *Central Power & Light Co. v. Public Util. Comm'n*, 36 S.W.3d 547, 561 (Tex. App.—Austin 2000, pet. denied). The evidence in the record may preponderate against the decision of the agency and nevertheless amount to substantial evidence. *Charter Med.*, 665 S.W.2d at 452; *Meier Infinity v. Motor Vehicle Bd.*, 918 S.W.2d 95, 98 (Tex. App.—Austin 1996, writ denied). We will uphold the agency's order unless the agency's decision is: not reasonably supported by substantial evidence, in violation of a constitutional or statutory provision, in excess of the agency's statutory authority, made through unlawful procedure, affected by other error of law, arbitrary or capricious, or characterized by an abuse of discretion. *See* Tex. Gov't Code Ann. § 2001.174(2)(A)-(F).

Certain issues raised by the parties involve questions of statutory construction, which we review *de novo*. *See, e.g.*, *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003) (appellate courts review matters of statutory construction *de novo*); *In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994) (questions of law are always subject to *de novo* review). When construing a statute, our primary goal is to determine and give effect to the legislature's intent. *City of San Antonio*, 111 S.W.3d at 25. To determine legislative intent, we look to the statute as a whole, as opposed to isolated provisions. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We begin with the plain language of the statute at issue and apply its common meaning. *City of San Antonio*, 111 S.W.3d at 25. Where the statutory text is unambiguous, we adopt a construction supported by the statute's plain language, unless that construction would lead to an absurd result. *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999). We give serious consideration to an agency's interpretation of the statutes it is charged with enforcing, so long as that interpretation

6

is reasonable and consistent with the statutory language. *Tarrant Appraisal Dist. v. Moore*, 845 S.W.2d 820, 823 (Tex. 1993); *Steering Comms. for the Cities Served by TXU Elec. v. PUC*, 42 S.W.3d 296, 300 (Tex. App.—Austin 2001, no pet.). This is particularly true when the statute involves a complex subject matter. *Steering Comms. for Cities*, 42 S.W.3d at 300. Courts, however, "do not defer to administrative interpretation in regard to questions which do not lie within administrative expertise, or deal with a nontechnical question of law." *Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 302 (Tex. App.—Austin 2001, no pet.).

Additionally, certain issues challenge the Commission's authority. The Public Utility Commission "is a creature of the Legislature and has no inherent authority." *Public Util. Comm'n v. GTE-Southwest, Inc.*, 901 S.W.2d 401, 407 (Tex. 1995). Like other state administrative agencies, the Commission "has only those powers that the Legislature expressly confers upon it" and "any implied powers that are necessary to carry out the express responsibilities given to it by the Legislature." *Public Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 316 (Tex. 2001). It is not enough that the power claimed by the Commission be reasonably useful to the Commission in discharging its duties; the power must be either expressly conferred or necessarily implied by statute. The agency may not "exercise what is effectively a new power, or a power contradictory to the statute, on the theory that such a power is expedient for administrative purposes." *Id.*

### Ratemaking Process

Before addressing the merits of the parties' contentions, we provide a brief discussion of the ratemaking process. Although the legislature in 1999 deregulated certain portions of the Texas electric market, including power generation and retail sales, the legislature did not deregulate

7

transmission and distribution utilities. *See* Tex. Util. Code Ann. § 39.001(a). The rates of all transmission and distribution utilities remain subject to regulation, and all of the traditional ratemaking rules and principles apply.

As a general rule, a utility's rates must be just and reasonable. *Id.* § 36.003(a) (West 2007). Regulated utilities are entitled to rates that allow them to collect total revenues equal to their cost of service and provide the utility an opportunity to earn a reasonable return on its invested capital. *Id.* § 36.051 (West 2007); *see Suburban Util. Corp.*, 652 S.W.2d at 363. Fundamental in the utility ratemaking process is the principle that utility rates are set for the future, not the past. *State v. Public Util. Comm'n*, 883 S.W.2d 190, 198-99 (Tex. 1994); *Railroad Comm'n v. Lone Star Gas Co.*, 656 S.W.2d 421, 425 (Tex. 1983).

Even so, ratemaking starts with an historic test year. *See GTE-Southwest, Inc.*, 901 S.W.2d at 411; 16 Tex. Admin. Code §§ 25.231(a) (cost of service), .234(b) (rate design) (2007) (Pub. Util. Comm'n). Because rates are to be charged in the future, the historic test-year amounts must be adjusted for known and measurable changes to more accurately reflect costs that will be incurred in the future. The Commission has the authority to incorporate known and measurable changes to test-year data at its discretion. *See City of El Paso*, 883 S.W.2d at 188; *see also GTE-Southwest, Inc.*, 901 S.W.2d at 411; 16 Tex. Admin. Code §§ 25.231(a)-(b) (cost of service), .234(b) (rate design). Once these adjustments have been made, the Commission must determine a reasonable rate of return. *See* Tex. Util. Code Ann. § 36.052 (West 2007). To establish a reasonable rate of return, the Commission considers several factors, including the efforts of the utility in conserving resources, the quality of the utility's service, the efficiency of the utility's operations, and

the quality of the utility's management. *Id.* With this general description in mind, we turn to the parties' complaints on appeal.

**Penalty for Initiating Rate Increase**

In its first issue on appeal, TCC complains that the Commission erroneously reduced TCC's proposed rates by imposing a $7.5 million penalty after determining that TCC had violated the terms of the Integrated Stipulation Agreement (ISA) signed when TCC's parent company American Electric Power (AEP) merged with Central and South West Corporation (CSW). TCC argues that the Commission misconstrued the unambiguous terms of the ISA and, therefore, erroneously reduced TCC's proposed rates. Because we conclude that the plain language of the ISA allowed the Commission to impose a penalty if it determined that TCC initiated a proceeding to increase rates within six years after the ISA was signed, we reject TCC's claim that the Commission erroneously imposed a penalty when it reduced TCC's proposed rates.

*A.    The ISA*

In April 1998, AEP and CSW initiated proceedings before the Commission seeking approval of the terms of their proposed merger agreement as required under section 14.101(b) of the PURA, which authorizes the Commission to review proposed combinations and "to determine whether the action is consistent with the public interest." *See* Tex. Util. Code Ann. § 14.01(b) (West 2007). The Commission opened Docket No. 19265 to consider various issues posed by the merger, and several parties intervened. During these proceedings, most of the parties reached agreement on the disputed issues and memorialized the terms of their agreement in the ISA.

9

Consistent with the Texas Supreme Court's holding in *City of El Paso v. Public Utility Commission*, the Commission made an independent evaluation of the merits of the ISA and determined that the terms of the ISA were just and reasonable and supported by substantial evidence. *See* 883 S.W.3d at 183. The Commission approved the terms of the ISA in its final order in Docket No. 19265.

The terms of the ISA recognized that the AEP/CSW merger would produce savings over previous operations and provided that the Texas AEP subsidiaries, including TCC, were to share those savings with ratepayers in fixed annual amounts known as "net merger savings rate reduction riders." To guarantee these savings, the ISA expressly limited the ability of the utilities to seek rate increases. For the first three years following the merger, the ISA prohibited the utilities from seeking any adjustment to rates, subject only to a force majeure exception. During years four through six, the utilities, including TCC, could seek an increase in rates, but doing so would trigger the ISA's penalty provision. This penalty provision required the utility to apply substantial predetermined "revenue requirement credits," or reductions, to offset any possible rate increase.

In relevant part, the ISA penalty provision states:

> In any proceeding initiated by a Texas operating company requesting an increase to overall base rate revenues to become effective prior to the end of the six year period after the effective date of the merger:
>
> (a)  The net merger savings expense item and annual amount of amortization of costs to achieve the merger will not be included in the calculation of the cost of service unless the Texas operating company demonstrates:
>
>    (i)  that the proposed rate increase results from circumstances not directly or indirectly related to the merger; and
>
>    (ii)  that the full level of achieved merger savings for the applicable year as reflected in Attachment D have been achieved; and

(b)     the revenue requirements otherwise determined to be reasonable and necessary will be reduced by the annual amounts included in Attachment E.[8]

### B.     The Commission's decision and TCC's claim

The Commission determined that the plain language of this penalty provision applied because TCC initiated a proceeding requesting an increase to overall base rate revenues. It is this determination that TCC challenges on appeal.

Arguing that the Commission misconstrued the language of the ISA penalty provision, TCC maintains that the Cities, not TCC, initiated the proceeding to increase base rate revenues. In support of this argument, TCC claims that six of the Cities "took the first decisive steps that began the rate proceeding" by adopting resolutions "to proceed with an inquiry into transmission and distribution rates charged by [TCC]."[9] Prior to any filings, TCC and the six cities agreed in a stipulation signed July 14, 2003, ("July 14th Agreement") that in lieu of filing separate rate packages with each city, TCC would file a standard rate filing package with each city and with the Commission on the same date. The July 14th Agreement reflects that TCC specifically agreed to make the filing with the Commission "in order to initiate the [Commission's] review of AEP Texas Central Company's rates." TCC argues that it only filed the ratemaking proceeding with the Commission in response to the Cities' rate inquiry.

---

[8]  *See* Tex. Pub. Util. Comm'n, *Application of Central & South West Corp. & Am. Elec. Power Co., Inc. Regarding Proposed Business Combination*, Docket No. 19265 (Nov. 18, 1999) (Final Order) (ISA § 3.F.(3)).

[9]  The cities of Corpus Christi, Edna, Harlingen, McAllen, Laredo, and Victoria all filed similar resolutions to inquire into TCC's rates.

11

Having approved the ISA as part of its final order approving the AEP/CSW merger, the Commission had exclusive jurisdiction to interpret the provisions of the ISA and to resolve any dispute arising therefrom, including the question of who initiated the proceeding. *See In re Entergy Corp.*, 142 S.W.3d 316, 324 (Tex. 2004); *Public Util. Comm'n v. Southwestern Bell Tel. Co.*, 960 S.W.2d 116, 119-20 (Tex. App.—Austin 1997, no pet.). The Commission's construction of the ISA is consistent with the plain language of the penalty provision.

We agree with the Commission that the plain language of the ISA mandates that the penalty provision applies "[i]n *any* proceeding initiated by a Texas operating company requesting an increase to overall base rate revenues" prior to the end of the sixth year after the AEP/CSW merger. (Emphasis added.) The penalty provision is not limited in its application to proceedings before municipalities, or to proceedings before the Commission, but applies in any proceeding in which the utility seeks an increase in base rate revenues. TCC, not the Cities, filed an application to increase its base rate revenues. It matters not whether this application was filed with the Cities or with the Commission. Because TCC's application sought an increase in base rate revenues, the Commission properly determined that the penalty provision applied. The Commission correctly observed that TCC could have filed an application seeking to defend its existing rates, but TCC chose instead to seek approval of an increase in its base rate revenues.[10]

---

[10] The Commission's decision is further supported by TCC's statement in its brief that TCC's filing "did nothing more than ensure that the overall outcome of the process would result in systemwide rates." There is nothing in the PURA that requires TCC to charge "systemwide" rates. Indeed, the PURA expressly allows for utilities to charge different rates for different customer classes. *See* Tex. Util. Code Ann. §§ 36.001(a)(1), .003(b)-(c) (West 2007); *see also id.* § 36.005 (West 2007) (allowing utilities to charge different rates for areas outside a municipality). Thus, TCC was not obligated to initiate a ratemaking proceeding at the Commission to charge systemwide rates. Having chosen to do so, TCC must accept the consequences of its action.

We likewise reject TCC's argument that the proceeding before the Commission was merely a continuation of proceedings before the municipalities. Neither the record nor the law supports this contention. The record reflects—and TCC acknowledges—that this proceeding was not an appeal from a decision by a municipality as permitted under sections 33.051, 33.052, or 33.053 of the PURA. *See* Tex. Util. Code Ann. §§ 33.051-.053 (West 2007). It was an original application filed with the Commission to increase TCC's base rate revenues and establish systemwide rates.

For these reasons, we overrule TCC's first issue.

### *Post-Test-Year Adjustments*

In its second issue, TCC complains that the Commission erred in adopting TCC's proposed "post-test-year adjustment" for reduced post-employment benefit expenses. TCC challenges the Commission's adoption of this particular adjustment, which was based on an actuarial study, because the Commission declined to adopt three other proposed post-test-year adjustments based on actuarial studies. TCC contends that the Commission's adoption of this adjustment was arbitrary and capricious. We disagree.

The record reflects that TCC proposed four post-test-year adjustments related to expenses for several categories of employee benefits, including employee pensions, group insurance, post-retirement benefits other than pensions (OPEBs), and post-employment benefit expenses. TCC witness Randall Hamlett testified that each of these proposed adjustments were based on an actuarial estimate of future costs anticipated to occur after the test year. The other parties challenged all but one of TCC's proposed post-test-year adjustments. The proposed adjustment for post-employment

13

benefit expenses was not challenged. In its final order, the Commission adopted only TCC's proposed adjustment for post-employment benefit expenses.

The supreme court has acknowledged that ratemaking relies substantially upon informed judgment and expertise and utilizes projections and estimates in virtually all areas. *See GTE-Southwest, Inc.*, 901 S.W.2d at 411. The Commission has broad discretion when setting the rates of public utilities. *See Texas Alarm & Signal Ass'n v. Public Util. Comm'n*, 603 S.W.2d 766, 772 (Tex. 1980); *Southwestern Bell Tel. v. Public Util. Comm'n*, 571 S.W.2d 503, 515 (Tex. 1978). The Commission's ratemaking authority includes the discretion to disallow improper expenses. *See Suburban Util. Corp.*, 652 S.W.2d at 362. The Commission may decide in its discretion whether to incorporate "known and measurable" changes to the test-year data. *See Office of Pub. Util. Counsel v. Public Util. Comm'n*, 185 S.W.3d 555, 566 n.14 (Tex. App.—Austin 2006, pet. denied); 16 Tex. Admin. Code § 25.231(a). We will not substitute our judgment for that of the Commission on the weight to be given the evidence on questions committed to the Commission's discretion. *Office of Pub. Util. Counsel*, 185 S.W.3d at 567; *see also* Tex. Gov't Code Ann. § 2001.174.

TCC would fault the Commission for adopting an *un*contested adjustment proposed by TCC merely because the Commission rejected other contested proposals. In support of its argument, TCC cites to statements made by the commissioners during their deliberations at an open meeting. However, it is immaterial what the commissioners may have thought or stated in the process of arriving at a decision. *See City of Frisco v. Texas Water Rights Comm'n*, 579 S.W.2d 66, 72 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.). Such statements are simply not relevant to the judicial determination of whether the Commission's final order was supported by substantial evidence. *Id.*

14

In its final order, the Commission gave independent reasons for its rejection of TCC's proposed post-test-year adjustments. The Commission's explanations were supported by the evidence and were not based solely on the rejection of actuarial studies.

With regard to employee pensions, the Commission adopted the ALJs' recommendation rejecting this post-test-year adjustment. In the PFD, the ALJs explained that they rejected the testimony offered by TCC witness Michael Turk regarding the adjustment for employee pensions. Turk testified that his projections were based on declines in the equity markets, declines in interest rates, a recent increase in actuarial liabilities, and his own prediction that these declines would continue into 2005. Turk further testified that he "could not predict with reasonable certainty" how stock prices or interest rates would affect future actuarial pension funding. Based on Turk's testimony, the ALJs determined that TCC's proposed adjustment for employee pensions was not a "known and measurable change" and recommended disallowance of this expense. The Commission adopted this recommendation in its final order.

With regard to OPEBs, the ALJs found that this expense item was subject to the Commission's rule 25.231(b)(1)(H)(i), which expressly requires such expenses to be based on "actual payments made." *See* 16 Tex. Admin. Code § 25.231(b)(1)(H)(i). Because TCC's proposed adjustment was based on actuarial projections, and not actual payments made, the ALJs determined that TCC's proposed adjustment for OPEBs did not comply with the Commission's rule and recommended that the Commission disallow this expense item. The Commission adopted this recommendation in its final order.

With regard to group insurance, the Commission determined that the evidence

15

presented by TCC did not satisfy the "known and measurable" standard for changes to test-year data. The record reflects that TCC presented the testimony of various witnesses, but none of these witnesses provided direct explanatory testimony on the issue of group insurance benefits. TCC witness Michael Turk testified generally that TCC provided various benefits including medical and dental benefits, but he did not testify about the cost of these benefits. And no other TCC witness testified about the costs of group insurance. In its final order, the Commission determined that the evidence presented by TCC was insufficient to support an increase above the test-year actual cost.

Finally, regarding post-employment benefits, TCC proposed a reduction in rates for this expense item. The record reflects that TCC presented evidence and testimony in support of this proposed adjustment. None of the parties challenged TCC's proposal. In the absence of any challenge to TCC's proposal, the Commission adopted TCC's proposed adjustment to reduce post-employment benefit expenses.

As a reviewing court, the issue before us is not whether we believe the Commission made the correct decision, but whether there is a reasonable basis in the record for the action taken by the Commission. *Charter Med.*, 665 S.W.2d at 452; *Central Power & Light Co.*, 36 S.W.3d at 561. Because no one challenged TCC's proposed adjustment to post-employment benefit expenses, we conclude that the Commission acted within its discretion to adopt TCC's proposal.[11] We

---

[11] Having requested and received the adjustment it sought for post-employment benefits, TCC was neither aggrieved nor prejudiced by the Commission's decision. It is therefore arguable whether TCC was entitled to judicial review, much less reversal, on this issue. *Compare* Tex. Util. Code Ann. § 15.001 (allowing any party to proceeding before the Commission to seek judicial review), *with* Tex. Gov't Code Ann. §§ 2001.171 (allowing only aggrieved parties to seek judicial review of agency decisions), .174 (authorizing reversal only where substantial rights have been prejudiced) (West 2000).

likewise conclude that the Commission's order was supported by substantial evidence, and we overrule TCC's second issue.

*Consolidated Tax Savings Adjustment*

In its third issue, TCC complains that the Commission erred in adopting an adjustment for consolidated tax savings. For the following reasons, we reject TCC's complaint.

Federal law allows affiliated corporations to file a single, joint income tax return, or consolidated tax return, in certain situations. *See* 26 U.S.C. § 1501 (2002). By filing a consolidated tax return, affiliated corporations can reduce their total tax liability by offsetting their otherwise taxable gains with the losses of their unprofitable affiliates. *See Central Power & Light Co.*, 36 S.W.3d at 555.

Because the potential for substantial savings exists when a corporation files a consolidated tax return, section 36.060 of the PURA requires the Commission to consider such savings when setting a utility's rates. Tex. Util. Code Ann. § 36.060 (West 2007). This section provides:

> Unless it is shown to the satisfaction of the regulatory authority that it was reasonable to choose not to consolidate returns, an electric utility's income taxes shall be computed as though a consolidated return had been filed and the utility had realized its fair share of the savings resulting from that return, if:
>
> (1)    the utility is a member of an affiliated group eligible to file a consolidated income tax return; and
>
> (2)    it is advantageous to the utility to do so.

*Id.* Under this provision, the Commission is required to calculate TCC's fair share of tax savings

17

resulting from the filing of a consolidated tax return. *Id.*; *see Central Power & Light Co.*, 36 S.W.3d at 555.

Here, the Commission determined and TCC agrees that TCC's parent company, AEP, enjoyed significant tax savings as a result of filing a consolidated tax return. However, in its rate filing package with the Commission, TCC failed to allocate any of AEP's tax savings to TCC. So, as required under section 36.060, the Commission adopted an adjustment to TCC's claimed income taxes to reflect TCC's appropriate share of consolidated tax savings.

TCC argues that the Commission lacked authority to make such an adjustment because section 36.060 only requires sharing of tax savings when a utility does *not* file a consolidated return. TCC's construction of section 36.060 conflicts with the plain language of that statute. Section 36.060 plainly requires the Commission to calculate TCC's taxes as though a consolidated return had been filed, unless TCC can show to the Commission's satisfaction that it was reasonable to choose not to consolidate tax returns. TCC does not attempt to demonstrate that it was reasonable for AEP to choose not to consolidate returns. Under the plain language of section 36.060, the Commission was therefore required to calculate TCC's taxes as if a consolidated return had been filed, which it was. We reject TCC's contention that the Commission may only consider a consolidated tax savings adjustment when the company does not file a consolidated tax return.

TCC further contends that the Commission's decision to adopt a consolidated tax savings adjustment was not supported by substantial evidence. Because the record demonstrates that the Commission's decision was supported by substantial evidence, we likewise reject this contention.

In its final order, the Commission reduced TCC's federal income tax expense by

18

$2,322,545[12] to account for consolidated tax savings. This amount was based on a proxy proposed by TCC,[13] which allocated TCC's share of consolidated tax savings over the relevant fifteen-year period based on TCC's rate base. This approach was consistent with the Commission's approach in TCC's last ratemaking proceeding, which was affirmed by this Court in *Central Power & Light v. Public Utility Commission*.[14] *See* 36 S.W.3d at 555-57. As the Commission explained in its final order, a consolidated tax savings adjustment is appropriately based on the value of the tax shield that the utility provides to the parent company and its nonregulated affiliates. The record evidence demonstrates that the Commission calculated the adjustment to TCC's taxes based on the value of the tax shield that TCC provided to its parent company. TCC witness Jeffrey Bartsch agreed that the adjustment adopted by the Commission was calculated in accordance with the Commission's past application of the "interest-credit"—or "rate-base"—methodology. We conclude that the Commission's decision was supported by substantial evidence, and we overrule TCC's third issue.

In a related issue, the Cities argue in their third issue on appeal that the Commission's consolidated tax savings adjustment failed to follow the Commission's own precedent and was not supported by substantial evidence. As a result, the Cities contend that the Commission's order fails to allocate TCC's fair share of consolidated tax savings to ratepayers.

---

[12] The consolidated tax savings adjustment was $1,509,656. This amount was "grossed-up" to $2,322,545 to capture the tax effect of the adjustment and to reflect the proper revenue requirement.

[13] TCC witnesses Jeffrey Bartsch and Donald Moncrief testified on remand regarding the proposed allocation and adjustment for consolidated tax savings.

[14] This approach is also known as the "interest-credit," "rate-base," or "time-value-of-tax-shield" methodology. We do not agree with the Commission's assertion that TCC challenges the methodology chosen by the Commission.

19

In support of this contention, the Cities cite to this Court's holding in *Reliant Energy, Inc. v. Public Utility Commission*, 153 S.W.3d 174 (Tex. App.—Austin 2004, pet. denied). The Cities' reliance on *Reliant Energy* is misplaced. In *Reliant Energy*, this Court recognized that "[t]he legislature has granted the Commission broad discretion in determining a utility's fair share of the savings arising from the filing of a consolidated tax return by the parent company." *Id.* at 198. As in *Central Power & Light*, we affirmed the Commission's use of the "time-value-of-tax-shield" methodology to calculate the appropriate consolidated tax savings adjustment. *Id.* at 198 n.13; *see also supra* n.14 (explaining that the time-value-of-tax-shield methodology is also referred to as the "interest-credit" or "rate-base" methodology).

As previously discussed, the Commission adopted the ALJs' recommendation on this issue, which was based on a proxy proposed by TCC. The Cities argue that the Commission should have adopted the Cities' proxy instead of that proposed by TCC. We conclude that the Commission's decision to adopt the proxy submitted by TCC was neither arbitrary nor capricious. The Commission was entitled to accept or reject, in whole or in part, the testimony of the various witnesses who testified. *City of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 695 (Tex. App.—Austin 2005, pet. denied). In light of our previous conclusions that the Commission's decision was consistent with its precedent and supported by substantial evidence, we overrule the Cities' third issue.

### *Affliate Costs*

In their first issue, the Cities argue that the Commission erred by including affiliate costs in TCC's cost of service without making the specific findings required by section 36.058 of the PURA. For the reasons that follow, we reject the Cities' complaint.

20

TCC originally requested $63.8 million in affiliate expenses. Section 36.058 of the PURA provides that the Commission may not include affiliate costs in a utility's rates unless the Commission makes a specific finding of reasonableness and necessity for each item or class of items, and also finds that the price charged by the affiliate to the utility is no higher than the price charged by the affiliate to other purchasers. *See* Tex. Util. Code Ann. § 36.058 (West 2007).[15] Because the Commission disagreed with the ALJs' recommendations regarding affiliate costs, the Commission

---

[15] In relevant part, section 36.058 states:

(a)     Except as provided by Subsection (b), the regulatory authority may not allow as capital cost or as expense a payment to an affiliate for:

    (1)     the cost of a service, property, right, or other item; or

    (2)     interest expense.

(b)     The regulatory authority may allow a payment described by Subsection (a) only to the extent that the regulatory authority finds the payment is reasonable and necessary for each item or class of items as determined by the commission.

(c)     A finding under Subsection (b) must include:

    (1)     a specific finding of the reasonableness and necessity of each item or class of items allowed; and

    (2)     a finding that the price to the electric utility is not higher than the prices charged by the supplying affiliate for the same item or class of items to:

        (A)     its other affiliates or divisions; or

        (B)     a nonaffiliated person within the same market area or having the same market conditions.

Tex. Util. Code Ann. § 36.058.

conducted its own hearing on this issue. The Commission heard evidence from all of the parties on affiliate costs. However, before the Commission made its final decision on this issue, TCC and TIEC filed a nonunanimous stipulation (NUS) proposing a $10.5 million disallowance to TCC's requested affiliate costs. The Cities did not oppose the adoption of the NUS, but they continued to oppose the level of administrative and general (A&G) expenses proposed by TCC, including $13.8 million of affiliate costs.

The Cities argued that TCC's A&G expenses were too high in relation to the A&G expenses of other utilities. Based on the testimony of two witnesses, the Cities argued that all of TCC's affiliate costs that were allocated to distribution A&G should be disallowed. Cities witness Gerald Tucker proposed an initial disallowance of $14.8 million in TCC's affiliate A&G costs. Cities witness A.D. Patton proposed an additional reduction of $13.8 million to TCC's affiliate A&G costs based on his comparison of TCC's A&G costs in relation to the A&G costs of other utilities.

In its final order, the Commission rejected the approach urged by Cities witness Patton and the Cities' claim that TCC's A&G expenses were too high when compared to other utilities. The Commission's final order adopted the ALJs' findings that all but two of TCC's A&G expenses were reasonable and necessary. With regard to affiliate costs, the Commission adopted the NUS proposed by TCC and TIEC. The Commission's final order included the following findings of fact:

158E.   The NUS proposed a disallowance of $10,501,860 in [affiliate] expenses . . . .

158F.   The NUS proposes to allocate the stipulated disallowance as follows: $10,300,935 to the distribution function and $200,925 to the transmission function.

158G. The stipulating parties agree that the remaining $53,289,706 in affiliate expenses, which consists of $49,860,227 in affiliate expenses from AEPSC and $3,429,479 in affiliate expenses from other affiliates, are reasonable and necessary, and that the price is not higher than the price charged by the supplying affiliate to its other affiliates or divisions or to nonaffiliated persons for the same item or class of items.

158H. The range of expert testimony regarding disallowances of affiliate costs are as follows:

Cities         $16.6 million
OPC            $13.4 million
CPL Retail     $10.3 million

The Commission's final order also included the following conclusions of law:

25A. $53,289,706 of TCC's affiliate expenses are reasonable and necessary, and the price charged to TCC is not higher than the price charged by the supplying affiliate to its other affiliates or divisions or to nonaffiliated persons for the same item or class of items.

25B. To be approved by the Commission, a non-unanimous stipulation must comply with applicable law; be just and reasonable, and in the public interest; and be supported by a preponderance of the record evidence. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 183 (Tex. 1994).

25C. The non-unanimous stipulation providing for a disallowance of $10.5 million in affiliate expenses is just and reasonable, and in the public interest, and is supported by a preponderance of the record evidence.

In light of their stipulated agreement, the Cities do not challenge the Commission's adoption of the NUS on appeal. Rather the Cities argue that the findings made by the Commission in relation to the NUS are insufficient to satisfy the requirements of section 36.058 of the PURA because they do not take into account those affiliate A&G costs challenged by Cities witness Patton. We disagree.

The record reflects that the NUS, as it was adopted by the Commission, covered all

23

$63.8 million of TCC's requested affiliate costs. Under the terms of the NUS, the Commission approved $53.3 million of affiliate costs and disallowed $10.5 million. With respect to the affiliate costs approved by the Commission, the findings and conclusions quoted above demonstrate that the Commission made the required findings under section 36.058 of the PURA. *See* Tex. Util. Code Ann. § 36.058. The Commission expressly found that the affiliate costs approved under the terms of the NUS were "reasonable and necessary, and the price charged to TCC is not higher than the price charged by the supplying affiliate to its other affiliates or divisions or to nonaffiliated persons for the same item or class of items." We conclude that this finding satisfies the requirements of section 36.058 for those affiliate costs approved under the terms of the NUS. *See id.* § 36.058(c)(1)-(2). Because the record demonstrates that the NUS covered all of TCC's requested affiliate costs, including those costs challenged by Cities witness Patton we conclude that the Commission was not required to make additional findings under section 36.058.[16] We overrule the Cities' first issue.

### *Quality of Service*

The Cities next argue that the Commission failed to consider TCC's quality of service when setting TCC's return on equity and that the Commission erred in severing quality of service issues into another proceeding. Accordingly, the Cities argue that the Commission's decision violates sections 36.052, 38.001, and 38.005 of the PURA. *See* Tex. Util. Code Ann. §§ 36.052; 38.001, .005 (West 2007).

---

[16] Because we conclude that the Commission's findings satisfied the requirements of section 36.058 and additional findings were therefore unnecessary, we do not address TCC's estoppel argument.

Section 36.052 requires the Commission to consider various factors when establishing a utility's reasonable return on invested capital. *See id.* § 36.052. Among those factors to be considered by the Commission are: the efforts and achievements of the utility in conserving resources; the quality of the utility's service; the efficiency of the utility's operations; and the quality of the utility's management. *Id.* Section 38.001 requires an electric utility to provide service that is "safe, adequate, efficient, and reasonable." *Id.* § 38.001. In addition, section 38.005 imposes service quality and reliability standards relating to the delivery of electricity by transmission and distribution utilities. *Id.* § 38.005. Section 38.005 authorizes the Commission to take appropriate enforcement action against those utilities who fail to meet the service and reliability standards imposed by the PURA. *Id.* § 38.005(b).

The record demonstrates that various witnesses testified regarding the appropriate return for TCC. Cities witness Stephen Hill testified that the appropriate rate of return was between 9.00% and 9.75%. Commission Staff witness Slade Cutter testified that the proper rate of return should be between 9.22% and 10.23%. CPL Retail witness Dr. Charles Smaistrla testified that the appropriate rate of return was 10.00% to 10.25%. OPC witness Dr. Carol Szerszen testified that the appropriate rate of return was 9.2% to 10.0%. TIEC witness Michael Gorman testified that the appropriate rate of return was between 9.2% to 10.5%. And TCC witness Paul Moul testified that the rate of return should be 12.00%.

In its final order, the Commission adopted the nonunanimous stipulation proposed by TCC, TIEC, CPL, and Commission Staff regarding TCC's return on invested capital. Under the terms of this stipulation, the Commission set TCC's rate of return at 10.125%. The Cities complain

that the Commission's decision fails to consider quality of service because the Commission severed *all* reliability and quality of service issues into another proceeding.

The record demonstrates that the Commission severed only the issue of "service quality commitments" into another proceeding. This issue concerned how rate credits related to service quality were to be calculated under TCC's "Service Quality Plan." Because the Commission was already considering service quality commitments in another pending proceeding,[17] the Commission severed this issue from TCC's rate case so that the Commission could consider all of the service quality commitments together.[18] The Commission did not sever the issue of service quality as it relates to TCC's rate of return.

The Commission's procedural rules expressly allow the Commission to sever a proceeding or an issue if such severance "would serve the interest of efficiency or prevent unwarranted expense and delay; and the applicant's ability to present its case and other parties' ability to respond to the applicant's case would not be unduly prejudiced." 16 Tex. Admin. Code § 22.34 (2007) (Pub. Util. Comm'n). The Texas Supreme Court has recognized that administrative agencies are entitled to considerable procedural flexibility, *see City of Corpus Christi v. Public Util. Comm'n*, 51 S.W.3d 231, 262 (Tex. 2001), and that courts may interfere with the procedures of an administrative agency only if they are arbitrary and capricious or deny due process. *Lewis v. Metropolitan Sav. & Loan Ass'n*, 550 S.W.2d 11, 16 (Tex. 1977). Accordingly, we conclude that

---

[17] Docket No. 25157 was established in 2001 to address certain elements of the "Service Quality Plan," which was created during the merger between AEP and CSW.

[18] That the Commission severed only the issue of service quality of commitments is confirmed by the plain language of TCC's motion to sever.

26

the Commission acted within its discretion to sever the issue of service quality commitments from Docket No. 28840 into Docket No. 25157.

The Cities do not contend that they were denied due process, but they do contend that, as a result of the severance, the Commission failed to consider one of the required statutory factors in section 36.052. We construe the Cities' claim to be that the Commission's order was arbitrary and capricious. *See, e.g.*, *City of El Paso*, 883 S.W.2d at184 (explaining that an agency's order is arbitrary when it fails to consider a factor that the legislature directs it to consider). But the record belies this claim.

TCC and the Commission agree that the Commission was required to consider TCC's quality of service when setting TCC's rate of return. The record reflects that the Commission's resolution of TCC's rate of return was based on a nonunanimous stipulation (different from the stipulation regarding affiliate costs), which only the Cities and one other party opposed. The Commission's final order includes the following findings of fact:

60. The terms of the Return Stipulation are that: TCC's ROE be set at 10.125%; its capital structure be set at 60% debt and 40% equity; its rate of return on invested capital be set at 7.475%; and no penalty be applied to TCC's ROE for quality or reliability of service.

\* \* \*

64. The quality of TCC's service is generally adequate and does not warrant a reduction i[n] TCC's ROE.

65. The stipulated return of 10.125% is more likely than not a reasonable return on TCC's equity.

The Commission's final order also included the following conclusion of law:

27

60. PURA § 36.052 requires the Commission to consider the "quality of the utility's services" and the "quality of the utility's management: in establishing a reasonable return on invested capital as part of the PUC's "establishing an electric utility's rates."

These findings and conclusion make clear that the Commission considered TCC's quality of service when determining TCC's ROE. The plain language of section 36.052 merely requires the Commission to consider the statutory factors. Tex. Util. Code Ann. § 36.052. It does not require the Commission to give weight to any particular factor. Consistent with our prior holdings, we conclude that the legislature left it to the Commission's discretion to weigh the importance of each factor in a given case. *See, e.g.*, *Meier Infinity*, 918 S.W.2d at 100. Because the Commission's final order contains underlying findings that reasonably and logically support the statutory criteria, we conclude that the Commission properly considered the required factor of quality of service. *Id.* We likewise conclude that the Commission's adoption of the nonunanimous Return Stipulation was proper.[19] *See City of El Paso*, 883 S.W.2d at 183. We overrule the Cities' second issue.

### Gains from the Sale of TCC's AREP

In their fourth and final issue, the Cities assert that the Commission improperly failed to allocate the gains from the sale of TCC's affiliated retail electric provider to ratepayers. The Cities argue that the Texas Supreme Court's decision in *Public Utility Commission v. Gulf States*

---

[19] The record demonstrates that the Commission considered the nonunanimous stipulation "on its merit" and found that it was based on a preponderance of the record evidence and that the proposed rate of return was reasonable and, therefore, in the public interest. *See City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 183 (Tex. 1994).

*Utilities Co.*, 809 S.W.2d 201, 211 (Tex. 1991), required the Commission to consider certain factors, which the Cities complain were not considered, in allocating any gain realized from the sale of utility assets. Because we conclude that the PURA does not authorize the Commission to allocate the gains from the sale of TCC's AREP to ratepayers, we reject the Cities' final complaint.

Pursuant to section 39.051 of the PURA, utilities were required to unbundle into three separate entities to accomplish the legislative mandate of deregulation. *See* Tex. Util. Code Ann. § 39.051 (requiring utilities to separate into a power generation company, a retail electric provider, and a transmission and distribution utility). This section contemplates that a utility might sell off its assets to accomplish the required separation and expressly provides that such transactions were not subject to those provisions in the PURA which require the Commission to capture gains on asset sales for ratepayers.[20] *Id.* § 39.051(g) (exempting unbundling transactions from the requirements of sections 14.101, 35.034, and 35.035 of the PURA).

The Commission concluded that the sale of TCC's AREP was an unbundling transaction within the meaning of section 39.051. The Commission also concluded that the sale of TCC's AREP did not involve any transmission and distribution assets. The Commission therefore refused to allocate any of the gains from TCC's sale of its AREP to ratepayers. The Cities point to

---

[20] Section 39.051(g) states:

Transactions by electric utilities involving sales, transfers, or other disposition of assets to accomplish the purposes of this section are not subject to Section 14.101, 35.034, or 35.035.

Tex. Util. Code Ann. § 39.051(g).

29

no other provision in the PURA that would require the Commission to allocate the gains from the sale of TCC's AREP to ratepayers. Because we conclude that the Commission's decision was consistent with the plain language of section 39.051(g), we reject the Cities' contention that the Commission was required to consider the factors identified by the supreme court in *Gulf States Utilities*. We likewise conclude that the Commission properly declined the Cities' request to allocate any gains from the sale of TCC's AREP to ratepayers. We overrule the Cities' fourth issue.

## CONCLUSION

Having concluded that the Commission's final order was consistent with the relevant statutes and was supported by substantial evidence, we affirm the district court's judgment, which affirmed the final order of the Commission.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   March 5, 2008

30